**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John D. MARBURY and Louis E. Doherty, Jr., Defendants-Appellants.**

No. 83–4117.

United States Court of Appeals, Fifth Circuit.

May 3, 1984.

---

Frank J. Gremillion, Baton Rouge, La., for Marbury.

Nathan S. Fisher, Baton Rouge, La., for Doherty.

Pshon Barrett, Asst. U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before REAVLEY and GARWOOD, Circuit Judges *.

GARWOOD, Circuit Judge:

Defendants John Marbury and Louis Doherty appeal their convictions for transporting, receiving, and concealing stolen equipment transported in interstate commerce, and for conspiracy to do so. They challenge the warrants authorizing searches of Doherty's property and appeal the denial of their motions to suppress the evidence found in these searches. In addition, they claim that the district court erred in admitting the hearsay statements of alleged coconspirators, in limiting the scope of cross-examination, and in giving certain instructions. We affirm both convictions.

In April or May of 1981, Louisiana law officers received information from the Mississippi State Police that a large Brockway truck, a trailer, and a bulldozer had been stolen on April 10, 1981 from the Foshee Construction Company in Mississippi. On the afternoon of May 5, the sheriff's office in East Feliciana Parish, Louisiana received a tip from a citizen that he or she had seen, on April 12, equipment matching the description of that stolen from Foshee turning onto the large gravel pit tract leased and operated by Louis Doherty, who owned the Gravco Sand and Gravel Supply Company. A second informant told officers the equipment was still on the Gravco premises on May 5. Armed with these reports, officers filled out an affidavit and obtained a warrant to search Doherty's property. They began the search late on the afternoon of May 5 and located the Brockway truck in a metal shed on the property. However, they stopped searching before locating the two other items, primarily because of encroaching darkness and their unfamiliarity with the property, which comprised over a hundred acres and had dunes and holes caused by excavation work. The following day, May 6, officers flew over the property in a helicopter and thought they spotted the remaining two items from the air. They then obtained a second warrant and conducted another search. During this search, officers noticed still other equipment on the property and, suspecting these items might also be stolen, noted the identification numbers. After checking the numbers with a national service, they obtained a third warrant for two additional pieces of equipment. A third search was conducted on May 7. These three warrants were all issued by the same magistrate, a Louisiana district court judge. One officer made the May 5 affidavit, another the May 6 and 7 affidavits. Also on May 7, a search was conducted on property belonging to Lester Higginbotham, who worked for Doherty as his superintendent. This search resulted in the recovery of three additional pieces of stolen equipment. Four pieces were recovered during the three searches of Doherty's property. In addition, the bulldozer that was an object of the first search was later found on property adjoining Doherty's.

Doherty and Higginbotham were then indicted along with Marbury and several other defendants. Because the other defendants entered guilty pleas, only these three stood trial. Before trial, the defendants moved that the evidence seized during the four searches be suppressed. A hearing was held before a magistrate who filed a written report and recommended that the motion be denied. The district court adopted the magistrate's report and recommendation. During trial, two alleged coconspirators of the defendants, both of whom participated in the actual thefts, testified for the prosecution. Larry Jones testified that he had been paid by Marbury for the equipment but that he never met Doherty or Higginbotham. Doherty, however, testified that he had paid Jones but did not know that the equipment was stolen. James Crawford, implicated all three defendants, stating that all had been present at the delivery of stolen equipment and that he had been paid by Marbury.

---

* This appeal is determined by a quorum of the three-judge panel to which it was regularly assigned, as one of the judges of the panel recused himself following submission of the case. *See* 28 U.S.C. § 46(d).

After considering the evidence, the jury acquitted Higginbotham but convicted the two appellants of conspiracy in violation of 18 U.S.C. §§ 2, 371, 2314, and 2315. Marbury received a five-year term of imprisonment and a $5,000 fine; Doherty, a five-year term and a $10,000 fine. This appeal followed.

## I.

### Validity of the Search Warrants

Appellants first contend that the district court erred in denying their motions to suppress the equipment seized during the three searches of Doherty's property.[1]

■ Before reviewing the merits of this contention, however, we must determine whether Marbury has "standing" to challenge the searches. We find that he does not. The record reflects that Marbury had no connection with the Gravco Sand and Gravel Supply Company or its premises. He had no ownership or similar interest in the company or its property nor was he an employee. Further, there is no indication in the record that Marbury was ever even present on the property. For these reasons, he lacked any reasonable expectation of privacy in the area searched, a status that is fatal to his Fourth Amendment claim. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Doherty alone, therefore, can challenge the validity of the searches.

### *The May 5 Search*

The first search of the Gravco premises was conducted pursuant to a warrant on May 5 and resulted in recovery of a Brockway truck earlier reported stolen in Mississippi. Doherty argues that this search was invalid because probable cause was lacking. The affidavit supporting the warrant was signed by a Louisiana state police officer and reads in pertinent part:

"THAT probable cause does exist for the issuance of a search warrant author-

izing the search of the grounds and sheds and other structures thereon, including a galvanized metal building, with sliding doors on front and 1 door on southwest corner facing LA. Hwy. 960, with 2 large caterpillar dozers sitting in front of building; owned by Plaquemine Sand and Gravel Company and leased to Lewis Doherty, at address of Gravco Sand and Gravel, Route 1, Box 213, Clinton, La. 70722, located 1.6 miles north of La. Hwy. 63 on La. Hwy. 960 on east side of highway, in Bluff Creek area, East Feliciana Parish, where certain stolen movable property, to-wit: one (1) burnt orange 1971 Brockway long nose diesel truck, Serial # 73913, bearing 1981 Miss. tag P/73–7675; one (1) yellow 1971 Hobbs lowboy trailer, Serial # F51502, bearing 1981 Miss. tag TL–16669, the said truck having the words 'Fooshee [*sic*] Construction Co.' on both doors; and one (1) 1979 Caterpillar D6D dozer with 'Swamp' type tracks, Serial # 6X854, is (are) believed to be secreted or concealed, and such probable cause is based upon the following: Affiant has information from the Bureau of Criminal Investigation, Miss. Dept. of Public Safety, that the above described equipment was stolen in Jackson, Miss., from Foshee Construction Co., on Friday night, April 10, 1981. Affiant received information on May 5, 1981, at 3:00 P.M., at the East Feliciana Parish Sheriff's Office, from a citizen who is known by affiant to be reliable and truthful, who saw a truck and trailer fitting the above description, hauling a large bulldozer, followed closely by a small red pickup truck, on the evening of April 12, 1981, turning into the above described property. Informant was travelling on the highway in front of the property at that time. Another informant, also reliable, has informed affiant that a truck fitting above description is on the property at the present time."

---

**1.** Appellants make no challenge before us to the May 7 search of Lester Higginbotham's property.

■ In reviewing the sufficiency of this affidavit, we are mindful that probable cause exists to issue a search warrant when "the magistrate was provided with sufficient reliable information from which he could reasonably conclude that the items sought in the warrant were probably at the location sought to be searched." *United States v. Morris*, 647 F.2d 568, 573 (5th Cir.1981). While we may make an independent review of the sufficiency of the affidavit, we must also give great deference to the magistrate's determination that probable cause was shown. *United States v. Fooladi*, 703 F.2d 180, 183 (5th Cir.1983); *United States v. Smith*, 686 F.2d 234, 238 n. 3 (5th Cir.1982).

*The Legal Standards: Aguilar-Spinelli/Gates*

■ At the time of the search and the trial below, warrants supported by the hearsay statement of an informant, such as this one, were subject to review under the standards delineated by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Aguilar* and *Spinelli* express a two-part test for evaluating an affidavit based on an informant's tip: the affidavit has to provide the reviewing magistrate sufficient indicia of both the veracity or reliability of the informant *and* the basis of his knowledge. Under the test, an informant's tip that would otherwise be insufficient can be bolstered by evidence from the affiant of independent observations either corroborating details of the tip or revealing patterns of suspicious activity. *United States v. Morisse*, 660 F.2d 132, 135 (5th Cir.1981). The *Aguilar-Spinelli* formulation also allows corroboration of an informant's tip by a second informant. *United States v. Harris*, 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2081–82, 29 L.Ed.2d 723 (1971) (plurality opinion) (ve-

racity of second informer shown because information was against his penal interest). Further, we have held that nonprofessional, identified informants need not satisfy the reliability prong, at least where the information is detailed and corroborated by police observation and investigation. *Fooladi*, 703 F.2d at 183.

In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), however, the Supreme Court "articulated a new, more flexible standard for evaluating the facial sufficiency of an affidavit based on a hearsay account of an informant's tip." *United States v. Kolodziej*, 712 F.2d 975, 977 (5th Cir.1983). The Court expressly rejected a rigid application of the two-part *Aguilar-Spinelli* standard and adopted in its stead a test that views the "totality of the circumstances." *Gates*, 103 S.Ct. at 2332.[2] Under *Gates*,

> "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* (citation omitted).

The informant's veracity, reliability, and basis of knowledge are still relevant and important factors in reviewing the reliability of a tip; however, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 2329.

*Applying the Standards*

We have held that the *Gates* decision has retroactive effect.[3] Therefore, we must as-

---

2. As the cases reflect, the *Aguilar-Spinelli* test has not been without flexibility. Nevertheless, *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), by shifting the focus of our inquiry, provides greater flexibility.

3. *United States v. Mendoza*, 727 F.2d 448 (5th Cir.1984) (denying petition for rehearing). That case involved a warrantless search, but we do not consider that distinction material to the retroactivity question.

sess the sufficiency of the May 5 warrant based on the "totality of the circumstances," though keeping in mind the concerns expressed in *Aguilar* and *Spinelli.*

In doing so, we find it helpful to review two cases in which this Court has applied the *Gates* formula. The first of these concerned a warrant based on a tip from an identified informant—the defendant's wife—who informed police that her husband had an illegal firearm. *United States v. Phillips,* 727 F.2d 392 (5th Cir.1984). Although we found reason to doubt the credibility of the informant, who later claimed that she had lied in giving the affidavit, we upheld the warrant based on a strong showing of the wife's basis of knowledge.[4] Another case achieved the contrary result. In *United States v. Kolodziej,* 712 F.2d 975 (5th Cir.1983), this Court found that "even under the more flexible 'totality of the circumstances' standard established in *Gates,* the government has failed to shoulder its burden of demonstrating there was sufficient probable cause . . . to support the search warrant." *Id.* at 977. This case involved three informers who stated that over the past year the defendant had supplied them with illegal drugs and had been paid from $500,000 to $1,000,000 in return. One of the informants also stated that Kolodziej kept money from drug transactions in his car trunk, but did not indicate how he gained this information. We found the affidavit insufficient to support a warrant authorizing a search of the defendant's home, car, and truck as it demonstrated neither the reliability nor the basis of knowledge of these informants.

As noted, this Court has consistently held that a magistrate's determination that an affidavit shows probable cause is entitled to "great deference" and should be sustained in "doubtful or marginal cases."[5] However, these principles were unavailable to support the warrant in *Kolodziej,* because "the magistrate never considered the affidavit purged of its tainted material." *Id.* at 977. No such factor is present here to prevent our usual "great deference" to the magistrate's determination.

In another respect, the May 5 warrant here is also more strongly supported than was the warrant in *Kolodziej,* or, for that matter, that in *Phillips.* In *Kolodziej,* we observed that "[t]he affidavit does not contain an affirmative allegation that any of the three informants was known to be reliable." *Id.* at 977. That was also the situation in *Phillips.* Here, by contrast, the affidavit expressly states that the informant is "a citizen who is known to affiant to be reliable and honest." While the absence of any specific facts forming the basis of affiant's knowledge in this respect unquestionably weakens the force of this statement, nevertheless it is not only an affirmative assertion of the informant's reliability and honesty, but it is also an assertion expressly made on the basis of the affiant's own knowledge. In the latter respect, it is at least slightly stronger than the comparable statements in *Aguilar* (informant described as "a credible person" without any indication that he or she was known to the affiant) and *Spinelli* ("[t]he Federal Bureau of Investigation has been informed by a confidential reliable informant . . ."), and is more nearly like, though not quite as strong as, the statement in

---

4. For example, she described in detail where her husband lived, where police could find the gun, and her husband's criminal record. She also claimed to have seen him in possession of the firearm. We stated that "[i]t does not appear possible that a stronger showing as to 'basis of knowledge' could have been made." *United States v. Phillips,* 727 F.2d 392, 399 (5th Cir.1984).

5. Recent decisions to this effect include the following. *United States v. Allen,* 588 F.2d 1100, 1105–06, *modified on other grounds,* 593 F.2d

709 (5th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. Fooladi,* 703 F.2d 180, 183–84 (5th Cir.1983); *United States v. Smith,* 686 F.2d 234, 238 n. 3 (5th Cir.1982); *Doescher v. Estelle,* 666 F.2d 285, 289 (5th Cir.1982); *United States v. Phillips,* 727 F.2d 392, 395 (5th Cir.1984). Indeed, we have even stated that the magistrate's determination "is conclusive in the absence of arbitrariness." *Bastida v. Henderson,* 487 F.2d 860, 863 (5th Cir.1973); *Allen* at 1106; *United States v. Hyde,* 574 F.2d 856, 862 (5th Cir.1978).

*United States v. Copeland,* 538 F.2d 639 (5th Cir.1976), which, though it was "marginal," we nevertheless said "may satisfy the second prong of the *Aguilar* standard." *Id.* at 641.[6]

The second "tip" described in the affidavit—that a truck fitting the description was still on the premises—can be given only the slightest independent significance, for it reflects no basis of the informant's knowledge and, though it does describe the informant as "reliable," it does not state that this assertion is made on the affiant's own knowledge of the informant or provide any other basis for it. However, under "a totality of circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability," *Gates,* 103 S.Ct. at 2329–30, 76 L.Ed.2d at 545, we should not disregard the fact that this second "tip" *does* furnish *some* corroboration for the first report.

Moreover, here, as in *Phillips,* there is a strong showing as to the first informant's basis of knowledge.[7] The report is based on firsthand observation. The informant has indicated that he or she was in a position—on the highway in front of Gravco Sand and Gravel—to adequately observe what was reported. Further, the affidavit reflects not merely that the informant saw a truck and trailer hauling a bulldozer, but that the truck and trailer "fit[ ] *the above* description" of those reported stolen from Mississippi. Although the affidavit does not reflect precisely in what respects the equipment did fit that description, the magistrate could fairly read this statement[8] to include the assertion that the informant described the truck he saw as being burnt orange and having "Foshee Construction Company" on its door, as the earlier portion of the affidavit described it.[9] Appellants never challenged

---

6. The affidavit in *Copeland* described the informant as "a confidential source personally known to me, and whom has a good reputation in the community which he lives and whom I have reasonable cause to believe is a reliable source of information." *Id.* at 640 n. 1. In *Phillips,* we cited *Copeland* with approval and noted that there, unlike *Phillips,* "the officer [affiant] ... had previous knowledge of the informant and believed him to be reliable." *Phillips* at 397.

   Moreover, here the circumstances under which the "citizen" reported making the observations ("travelling on the highway"), taken with the statement that he or she was "known to affiant to be reliable and honest," do not suggest a professional informant or a person involved in the offense. That the "citizen" is unidentified prevents us from giving special weight to these circumstances, *see Phillips* at 396–97, but does not deprive them of all relevance.

7. Appellants also argue that the first informant's tip was stale because the equipment was reportedly seen on April 12 but the report to the police and the search did not occur until May 5, twenty-five days later. This argument lacks merit. In *United States v. Barfield,* 507 F.2d 53, 58 (5th Cir.1974), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975), we rejected a claim of staleness where there was a forty-day delay. *See also United States v. Rosenbarger,* 536 F.2d 715, 719–20 (6th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977). ("The assumption that stolen goods delivered to a particular place will be there a mere 21 days later is imminently reasonable." *Id.* at 720.)

Further, the May 5 report is also to be considered.

8. No "elaborate specificity" is required of such an affidavit. *Gates,* 103 S.Ct. at 2330, 76 L.Ed.2d at 546. Its review should not be "hypertechnical." *Id.* 103 S.Ct. at 2331, 76 L.Ed.2d at 547. Rather, "an affidavit for search warrant is to be interpreted in a common sense and realistic manner." *United States v. Maestas,* 546 F.2d 1177, 1180 (5th Cir.1977); *Doescher v. Estelle,* 666 F.2d 285, 289 (5th Cir.1982).

9. We believe that the magistrate could judicially know that burnt orange is a distinctive color and quite unusual for this kind of truck. While the Foshee insignia was no longer on the truck when it was recovered, there is no indication in the record that it had been removed prior to its arrival at Gravco Sand and Gravel. (In fact, at trial, the prosecuting attorney asked Doherty the following question: "What did you think when he [Larry Jones] showed up with a truck that had Foshee Construction Company on the door?" Doherty responded: "I can't question that at all. He had already been involved with me in two or three pieces of equipment I bought from him. I don't know what all the man's business interests are." Higginbotham, however, did not recall the Foshee insignia.)

   We, of course, agree with appellants that the magistrate could not have reasonably believed that the informant could have seen the serial numbers on the equipment. Nor do we believe, however, that the term "fitting the description" implies that the equipment matched in all par-

any statement in the affidavit on the ground that it is false or misleading, and never asserted that the informant did *not* in fact advise the affiant of the truck's color and the name on it. *See United States v. Namer*, 680 F.2d 1088, 1093 (5th Cir.1982).

■ This affidavit, of course, does not provide the highly detailed account found in *Phillips*. Nevertheless, taking a commonsense approach and considering the totality of the circumstances, we believe the affidavit as a whole provided, though perhaps only by the barest of margins, sufficient indicia of reliability to "ensure that the magistrate had a 'substantial basis' for his determination" that there was a "fair probability" the stolen equipment was on Doherty's property. *Gates* requires no more. A contrary conclusion would not be consistent with the "great deference" due the magistrate's determination and our obligation to sustain that determination in "doubtful or marginal cases." *See* note 5, *supra*. Therefore, we uphold the May 5 search.[10]

*The May 6 Search*

Because of the late hour, a steady downpour of rain, and the size of the gravel pit, officers halted their search on May 5 without finding the Hobbs lowboy trailer and the bulldozer described in the affidavit. On the following day, however, officers flew over the property in a helicopter and from the air spotted a yellow trailer and a bulldozer. They then secured a second search warrant that same day and returned to the gravel yard. The affidavit supporting this warrant referenced the May 5 search, the recovery of the stolen Brockway truck, the helicopter overflight, the view from that perspective of "a caterpillar

D6 bull dozer which appeared to be concealed in the hollow of a sand dune; and a float type trailer (gooseneck, low boy, triple axle trailer) bright yellow in color and having the appearance of having been freshly painted ... located on the said property on a dirt road approximately ⅛ mile east of the galvanized metal building [where the stolen truck was found]," and the April 10 theft of similar equipment.

■ Appellants challenge the May 6 search on essentially two grounds. First, they argue that, if viewed as a continuation of the previous day's search, it is invalid because that search was invalid. Second, they argue that the helicopter overflight was an unconstitutional search and thus could not provide the basis for a search warrant. Neither ground has merit. We have upheld the May 5 search and the magistrate's determination that probable cause existed to believe the items searched for were on the Gravco premises. Nor did the helicopter flight amount to an unconstitutional search given these circumstances. To begin with, the "open fields" doctrine, as reaffirmed and explained in the Supreme Court's recent opinion in *Oliver v. United States*, —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), would appear to be fully applicable to authorize entry onto and observations of the plainly noncurtilage portions of this large tract, such as the sand dunes and roadways an eighth of a mile from the vehicle shed. Further, even absent the "open fields" doctrine, aerial surveillance without a warrant of an area such as this large commercial gravel pit tract does not amount to an unconstitutional search, at least where, as here, it is for the purpose of verifying a particularized, justifiable belief concerning criminal activity associated with the premises.[11] *See Oli-*

ticulars, only those most distinctive and apparent.

10. We emphasize that our decision in this close case rests in large part on the distinctive features of the equipment. It is unlikely that a report merely of a truck, trailer, and bulldozer, at a point approximately four hours' travel from where they were stolen, would be sufficient, without more, to show probable cause.

11. Here, we have upheld the magistrate's determination that there was probable cause to search the premises on May 5 for three items of stolen equipment, and the May 5 search, the day before the flight, had recovered one of these items. There is no indication that any defendant—or anyone else—lived on the tract. There is no showing or claim that the helicopter flight

*ver*, 104 S.Ct. at 1741 n. 9; *United States v. Allen*, 675 F.2d 1373, 1381 (9th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981) ("If there is some justification for concentrating a surveillance on a particular place, as opposed to random investigation to discover criminal activity, that factor is weighed in the balance and contributes to justification for the surveillance."); *United States v. DeBacker*, 493 F.Supp. 1078, 1081 (W.D.Mich.1980) ("The police here did not regularly view defendant's property in the hopes of happening upon a crime. Instead, the police, acting upon an anonymous telephone tip, merely sought to verify it in as non-obtrusive a way as possible.").[12] We reject the challenge to the May 6 search.

### The May 7 Search

Appellants contend that the May 6 search, even if otherwise valid, was converted into a general, improper search when the officers copied down identification numbers from several items of equipment not named in the second warrant. For this reason, they argue, the May 7 warrant and search based on the results of this action were invalid. We disagree and uphold the warrant.

■■■■ It is true, as appellants suggest, that the Fourth Amendment protects against exploratory searches with or without a warrant. *United States v. Rabinowitz*, 339 U.S. 56, 62, 70 S.Ct. 430, 433, 94 L.Ed. 653 (1950). Yet officers who are legally on property to search for specified items may seize other evidence that is in plain view and that they discover inadvertently. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971). Further, we have held that the police are "not required to ignore the significance of items in plain view even when the full import of the objects cannot be positively ascertained without some examination." *United States v. Roberts*, 619 F.2d 379, 381 (5th Cir.1980). *See also United States v. Hillyard*, 677 F.2d 1336, 1341–42 (9th Cir.1982) ("... an officer may inspect an item found in plain view to determine whether it is evidence of a crime if he 'has a "reasonable suspicion" to believe that the discovered item is evidence.' "); *United States v. Ochs*, 595 F.2d 1247, 1256–57 & 1257 n. 8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979) (right to inspect "suspicious object" come upon in course of legal search).

■■■■ We find that the plain view doctrine applies here. The May 7 warrant was requested to search for a 580C Case backhoe and a yellow utility trailer. According to the May 7 affidavit, the affiant, Officer Bell, observed the equipment on May 6, "while searching the property for certain

---

was especially low or otherwise unusually intrusive.

**12.** Appellants also attack the May 6 search because the evidence indicates that when the officers, in executing the warrant, reached and superficially inspected the D6 bulldozer they had observed from the helicopter in the sand dune hollow earlier that day, they discovered it was not the D6*D* bulldozer described in the affidavit, as they had thought it was when they observed it, but was rather a D6*C*, which also had been stolen. However, that the officers' helicopter observations were mistaken in respect to this one piece of equipment, does not destroy the validity of the warrant, there being no showing that the mistake was unreasonable or in bad faith. "We do not decide such questions with hindsight." *United States v. Wysocki*, 457 F.2d 1155, 1160 (5th Cir.), *cert. denied*, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972). Nor was there any reason to suppress the officers' testimony as to their finding and identification of this particular D6*C* bulldozer on the property, as they found and superficially inspected it, noting its serial number, in the open area, in plain view and in the good-faith execution of a valid warrant. *See* authorities discussed in the text *infra*, in connection with the May 7 search.

We do not understand appellants to attack the *seizure*, as such, of this bulldozer, should we find the *search* for it valid. In any event, as above-indicated, the officers' location and identification of this bulldozer was proper. Other testimony—from its owner—established that this item was stolen, and there was no objection to or motion to suppress such testimony. The evidence at the suppression hearing does not show that the ensuing *seizure* of this bulldozer (as distinguished from the proper search for and on-site identification of it) tainted any evidence to which defendants made objection or motion to suppress.

items of stolen property, by authority of a duly issued search warrant," noticed that the equipment so observed fit the description of items which had been reported as stolen, copied down the identification numbers, and, through these numbers, subsequently confirmed his hunch that the equipment was stolen. The evidence at the suppression hearing does not establish that the officers had to use particularly intrusive means to retrieve the numbers, or that they came across the two items of equipment named in the May 7 affidavit other than while these two items were in the open and in the officers' plain view during their execution of the May 6 warrant.[13] The burden was on appellants to establish the invalidity of the May 7 warrant. *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981). Moreover, even if we were to conclude that the officers turned the May 6 search into a general search and, as a result of such a general search (rather than incident to searching for the items mentioned in the May 6 warrant), discovered the items mentioned in the May 7 affidavit, it nevertheless appears that the items listed in the May 7 affidavit were found on May 6 in the "open fields," not in any building or curtilage, and that the same is true respecting the results of the May 7 search itself.[14]

Hence, under the circumstances of this case, the decision in *Oliver* would preclude effective challenge on the grounds asserted both to the information in the May 7 affidavit and to the results of the May 7 search. Accordingly, we likewise sustain the May 7 search.

## II.

### The *James* Hearing

Appellants next contend that the district court erred in admitting the hearsay statements of coconspirator James Crawford under Rule 801(d)(2)(E), Fed.R.Evid.[15] We disagree.

For such statements to be admissible: (1) there must be a conspiracy; (2) the statement must be made during the course and in furtherance of the conspiracy; and (3) the declarant and the defendant must be members of the conspiracy. *United States v. James*, 590 F.2d 575, 578 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). In *James*, we held that the judge alone is to determine whether the statements are admissible. *Id.* at 579–80. The "trial court's threshold determination of admissibility is normally to be made during the presentation of the government's case in chief and

**13.** Actually, appellants' "general search" contention regarding the May 6 search is based almost exclusively on the *trial* testimony, principally that of Officer Harrell (Officer Bell, who executed the May 6 and 7 affidavits, did not testify either at trial or at the suppression hearing). The evidence at the suppression hearing, apart from the warrants, affidavits for same, and returns thereon, was extremely brief, general, and sketchy. The magistrate who conducted the suppression hearing found that the items were within the plain view of the officers during their legal May 6 search. He denied the motion to suppress. No objections to the magistrate's report were filed, and it was adopted and approved over three weeks later by the district court. The motion was not renewed at trial, and at trial no objections (or motions) were made on the grounds of illegal search or seizure to any evidence or testimony. Nor was the matter otherwise raised by any trial or post-trial motion. In these circumstances, our review is limited to the evidence at the suppression hearing. *See* 3 LaFave, *Search and Seizure* § 11.1 at

481 (1978) ("When a defendant's appeal is based solely upon the pretrial ruling, appellate courts ordinarily consider only evidence produced at the hearing on the pretrial motion.").

**14.** As observed (*see* note 13 and accompanying text, *supra*), the evidence at the suppression hearing does not establish the invalidity of the May 7 warrant on the ground asserted, apart from any consideration of the "open fields" doctrine. If the trial testimony is turned to, it is still doubtful that defendants established their claim in this respect. In any event, the trial testimony makes it apparent that the items listed in the May 7 affidavit were observed on May 6 in the "open field," and that the seizure on May 7 was likewise so made.

**15.** This rule provides that a statement is not hearsay if "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E)

before the evidence is heard by the jury." *Id.* at 581. At this point in the trial, we require that "as a preliminary matter, there must be *substantial, independent* evidence of a conspiracy at least enough to take the question to the jury." *Id.* (emphasis in original) (citation omitted). At conclusion of all the evidence, "on appropriate motion," the court must determine whether the prosecution has satisfied the requirements of admissibility by a preponderance of independent evidence.

■ Here, the district judge held a *James* hearing after the defendants raised a hearsay objection during the testimony of James Crawford.[16] The defendants argue, however, that this hearing was defective in two respects. First, they contend that the court erroneously allowed introduction of the hearsay statements at issue during the *James* hearing itself. This contention has merit. We have held that the *James* determination must be on the basis of independent evidence; "otherwise, a coconspirator's hearsay might bootstrap itself into admissible evidence." *United States v. Grassi*, 616 F.2d 1295, 1300 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1981). For this reason, the court erred in considering during the *James* hearing, certain hearsay statements by Crawford.[17] The error was harmless, however, because, even in the absence of these statements, there was substantial evidence both that a conspiracy existed and that the defendants Doherty and Marbury were participants in it.

For example, even prior to the hearing, witnesses had identified equipment found at the Gravco property as having been stolen from them or their employers. The Gravco property was leased to and controlled by Doherty. In addition, Jones, another coconspirator testifying for the prosecution, had stated that he generally sold the stolen equipment through Marbury, that Marbury paid him in cash, and that Marbury never asked for a bill of sale. During the *James* hearing, Crawford also testified as to Marbury's participation. He stated that he had contacted Marbury directly on one occasion, that he had told Marbury he had another piece of equipment coming, that Marbury was present when he delivered the equipment, and that Marbury subsequently paid him. His testimony also directly implicated Doherty. He stated that he met with Doherty and Higginbotham "on a deal I went down there on my own with," and that Doherty was present at the store where he delivered the stolen equipment.[18] He also testified that Doherty was present during delivery of the Foshee Construction Company Brockway truck, although he did not speak with Doherty on that occasion.[19] We find that the

---

16. Defendants had moved for a *James* hearing prior to trial but this motion was not acted upon.

17. For example, Crawford testified that Jones had told him Doherty's and Higginbotham's names.

18. He testified as follows:

"Q. Did you go to the car wash again?
"A. No, sir, went to the store right beside the bank at the car wash. They are all right together.
"Q. Who did you make contact with when you got down there?
"A. Mr. Doherty, Mr. Higginbotham and Johnny Marbury.
"Q. How did that deal go down? Tell the Judge how it went down?
"A. I called. Everything went okay on our end. I called from the truck stop between Jackson and there and told Johnny what time we'd be there, have somebody meet us. At

approximately seven o'clock in the morning, they was all three there. Johnny was there in his car. They was in a red Chevy Luv truck. Took the equipment from there. Johnny gave me a hundred dollars for during the day; I had to go where he worked later on during the day to collect the balance of it.
"Q. Did you do that?
"A. Yes, sir, I did."

19. In response to cross-examination by one of the defendant's attorneys, Crawford testified:

"Q. Well, what did you say to Mr. Higginbotham and Mr. Doherty that day, early that morning?
"A. I just told him I had brought the backhoe. Johnny drove up at the same time, too. And they got in the truck and drove off, told them to keep the truck, we wasn't taking it back.
"Q. That's all the conversation there was?
"A. Yes, sir.

admissible testimony of Crawford, coupled with the prior testimony of the other witnesses, was sufficient to meet the threshold requirement under *James*.

Second, however, the appellants contend that the district court failed to rule on the admissibility of the hearsay statements. In support of this contention, appellants point to the following exchange between the prosecution and the district judge:

"MR. TUCKER: If the Court please, the James decision requires that you at least make a statement at this point that there is sufficient evidence of the conspiracy independent of the hearsay to justify it.

"THE COURT: I'm not familiar with that decision of the circuit. But it seems to me that these people were all together. He says one of these fellows stayed in his room, and I think that they were so close and they look like engaged in the same enterprise. I certainly think that there is enough there for the jury to pass on. If there is any conflict, let them make the decision as to the conflict. That's about all I've got to say. Put them in the box."

Appellants argue that the court's statement reflects that it could not resolve the conflict between Jones' and Crawford's testimony and thus could not make the requisite *James* ruling. We reject this interpretation. The court clearly indicated that there was "enough there for the jury to pass on." We read the statement that the jury would "make the decision as to the conflict" as simply recognizing that the jury had the ultimate responsibility for determining appellants' guilt of the conspiracy count with which they were charged, and the credibility of each witness and the weight his testimony should receive.

We have held that it is not normally reversible error to fail to hold a separate *James* hearing, *United States v. Montemayor*, 703 F.2d 109, 117 (5th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *United States v. Nicoll*, 664 F.2d 1308, 1312 (5th Cir.), *cert. denied*, 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982), although "[u]pon proper motion at the close of all the evidence" the district court must review the evidence and conclude that independent evidence establishes the predicate for the admissibility of the coconspirators' out-of-court statements. *Id.* at 1311. Here, however, appellants made no such motion after the jury was recalled following the *James* hearing.

■ There was substantial evidence independent of the coconspirators' out-of-court statements establishing the existence

"Q. Prior to that time am I correct you had never spoken to Higginbotham or Doherty?
"A. No, sir.
"Q. All right. Did you run into them again on other trips?
"A. Yes, sir.
"Q. When was the next time?
"A. Run into them when we took, well, Mr. Higginbotham picked up most of the equipment, but ran into both of them on the Foshee truck, last one, D6D.
"Q. What was the conversation again?
"A. Larry Jones talked to them. We met them there at the church before you get to the car wash.
"Q. Okay. Mr. Jones had a conversation with them?
"A. Yes, sir.
"Q. So on this occasion Mr. Jones and you did not leave the truck there, or the truck and trailer and go away and then come back later?
"A. No, we turned the truck over to them.
"Q. Okay. Am I correct when you said Mr. Jones had a conversation with them on this occasion at the Baptist Church, that you did not have a conversation with them, is that right?
"A. Right.
"Q. So you were what, off to the side somewhere?
"A. Parked right beside the truck.
"Q. So you were not a partaker of that conversation?
"A. That's right.
"Q. Don't know what they said?
"A. No.
"Q. And that was, I think you said, the last trip?
"A. Yes, sir, I believe it was.
"Q. So am I correct the only thing you have ever heard Mr. Higginbotham say, Mr. Doherty say—strike that. Let me start over again.
"Am I correct that the only conversation between yourself and Mr. Higginbotham and Mr. Doherty was on that one occasion when you told them they could keep the truck?
"A. Yes, sir."

of the conspiracy, that the declarants and appellants were members of it, and that the statements were made in furtherance of it. Under all the circumstances, including the district court's informal remarks at the conclusion of the *James* hearing and the absence of any subsequent motion by appellants, "the failure to articulate findings and conclusions that *James* has been met does not constitute reversible error." *United States v. Winship*, 724 F.2d 1116, 1121–22 (5th Cir.1984).

### III.

### Cross-Examination During *James* Hearing

Appellants also contend that they were denied their full right of cross-examination during the *James* hearing because the court allowed only one attorney to conduct the cross-examination of Crawford, though each was allowed to submit questions through this attorney. They argue that this decision by the court amounted to a denial of their Sixth Amendment confrontation rights. This issue, for several reasons, does not merit reversal of the appellants' convictions.

■ First, we have recognized that the district judge has significant control over the scope of cross-examination. *United States v. Bright*, 630 F.2d 804, 816–17 (5th Cir.1980). Second, and more important, the *James* hearing has a limited purpose—to determine whether there is substantial evidence of a conspiracy at that point—and is held outside the hearing of the jury. Moreover, *James* does not require a separate evidentiary hearing nor does it mandate a particular form of hearing. *United States*

*v. Nichols*, 695 F.2d 86, 90 (5th Cir.1982). Appellants were allowed a full opportunity on the part of each attorney to cross-examine Crawford during his testimony before the jury and, further, could have moved, at the close of evidence, that his out-of-court declarations be excluded. Finally, appellants do not even assert that this limitation prejudiced them in any manner. While we generally disapprove of this character of limitation on cross-examination, we are unable to conclude that any error in this respect was likely of material prejudice to appellants. Hence, no reversible error appears.

### IV.

### Claimed Instructional Errors

Finally, appellants contend that the district court erred in two of its instructions to the jury: (1) a deliberate ignorance instruction; and (2) an instruction that guilty knowledge can be inferred from possession of stolen property.

■ Rule 51, Fed.R.Civ.P., expressly requires that a party objecting to any instruction must state "distinctly the matter to which he objects and the grounds." Appellants did not comply with this rule, but stated only that they "object to" each of six specified instructions by the court, including the two at issue on this appeal.[20] We have repeatedly held that a wholly general objection of this sort, which gives no hint of the claimed infirmity in the challenged instruction, is insufficient to preserve a specific asserted deficiency for appellate review. *Delancey v. Motichek Towing Service Co.*, 427 F.2d 897, 900 (5th

---

**20.** While the record suggests that possibly the appellants had previously made objections to the court off the record, there is absolutely no way for us to determine *either* if this in fact occurred *or*, if it did, what the substance or even the general thrust of any objections thus made were. Appellants' counsel stated at argument that he recalled, or believed he recalled, making some specific objections at an on-the-record conference not then included in the record on appeal, and stated he would supplement the record on appeal if his recollections in this respect proved accurate. Appellants have not

sought to do so in the some three months since then. The government took the position that it recalled no objections being made at any time, except the general objections reflected in the record on appeal before us at argument. Appellants also objected to the district court's failure to give certain of their requested charges, but those objections have not been urged on appeal. Appellants do not claim, nor does the record establish, that they did not have a wholly adequate opportunity to make full on-the-record objections to the charge.

**404**

Cir.1970) (and cases cited therein). Therefore, we can reverse on the basis of these instructions only if we find plain error or, as we have indicated, "unless the error is so fundamental as to result in a miscarriage of justice." *Whiting v. Jackson State University,* 616 F.2d 116, 126 (5th Cir.1980). Appellants do not meet this standard.

## V.

### Conclusion

We have considered each of appellants' claims of error, and found none that warrant reversal. Their convictions are accordingly affirmed.

AFFIRMED.