UNITED STATES of America,
Plaintiff-Appellee,

v.

Roberto CASCANTE–BERNITTA,
Defendant-Appellant.

No. 83–3043.

United States Court of Appeals,
Fifth Circuit.

July 14, 1983.

Certiorari Denied Oct. 11, 1983.
See 104 S.Ct. 252.

Virginia Laughlin Schluter, Federal Public Defender, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Harry W. McSherry, Howat A. Peters, Jr., Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE and POLITZ, Circuit Judges.

PER CURIAM:

In December of 1982, a jury found Roberto Cascante-Bernitta, a citizen of Ecuador, guilty of illegally importing cocaine with intent to distribute. 21 U.S.C. §§ 841(a)(1), 952. On appeal, Bernitta urges that the district court erred in denying his motion to suppress evidence of the cocaine. For the reasons enumerated below, we conclude that the evidence was properly admitted.

## FACTUAL BACKGROUND

The facts are undisputed. Mr. Bernitta, a merchant seaman, arrived at New Orleans International Airport from Ecuador to join a ship temporarily ported in the United States. Upon arrival, Bernitta made a formal application for a nonimmigrant visa. Because he did not have the correct visa for entry into the United States to work, immigration authorities advised Bernitta that his papers were not in order and that he would not be allowed to join his ship in the United States. At this time, Bernitta was presented with an option of either pursuing his application for a nonimmigrant visa by contesting the refusal to grant his entry or withdrawing his application and returning to his port of origin. It was explained that if he chose the former course, he would remain in custody until a formal hearing could be conducted.

Presented with these two options, Bernitta elected to return to Ecuador. In response to this request, immigration officials advised Eastern Airlines, Bernitta's carrier, that he would have to be taken into custody and returned to his port of origin at the carrier's expense. Eastern signed the appropriate papers accepting Bernitta into its custody. Subsequent to being released to Eastern's custody for his return trip, Bernitta was taken to the customs area of the New Orleans Airport and searched. Customs officials discovered approximately two pounds of cocaine in Bernitta's garment bag.

Bernitta was indicted for importing cocaine with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 952. At trial, Bernitta moved to suppress evidence of the cocaine on the theory that the customs search was unreasonable in light of his election to return to his port of origin. The district court denied this motion; and a jury found Bernitta guilty of the counts contained in the indictment. Bernitta now appeals this conviction.

## THE MERITS

The sole issue on appeal is whether the motion to suppress evidence should have been granted. While acknowledging the plenary authority of customs officials to search all persons entering the country, see *United States v. Sandler,* 644 F.2d 1163, 1165 (5th Cir.1981) (en banc), Bernitta contends that once an individual affirmatively indicates a desire to return to his port of origin "a customs search . . . cannot be justified as there is no threat of entry of contraband or other prohibited articles." The argument is clever—but not intelligent.

It is beyond peradventure that it is constitutionally permissible to conduct border searches even absent a suspicion of wrongdoing. *See Sandler, supra.* The view informing this principle was articulated in *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), as follows:

> Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.

Extrapolating from the above reasoning, our decisions have held that "[t]here is reasonable and probable cause to search every person entering the United States from a foreign country, by reason of that entry alone." *Sandler, supra,* at 1165 (quoting *United States v. Rivera-Marquez,* 519 F.2d 1227, 1228 (9th Cir.), *cert. denied,* 423 U.S. 949, 96 S.Ct. 369, 46 L.Ed.2d 285 (1975); *see also United States v. Cristancho-Puerto,* 475 F.2d 1025 (5th Cir.1975). In this regard, a customs agent's "statutory authority to search is virtually unfettered

except perhaps as to due process concerning the manner, not cause of the search." *United States v. Storm,* 480 F.2d 701, 704 (5th Cir.1973). Here Bernitta presented himself at the functional equivalent of a border, *see United States v. Walters,* 591 F.2d 1195 (5th Cir.), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979), in order to gain entry into the United States. Entry was denied because he possessed the wrong visa. While Bernitta elected to leave rather than submit to detention, the record reveals that he was to be paroled into the custody of Eastern Airlines and thus temporarily paroled into the United States, although he had no legal status to remain.[1] Although Bernitta entered the country somewhat differently than planned, he in fact voluntarily presented himself for entry and—no matter how temporarily—did in fact gain entry. On that fact alone, the customs officials were well within the scope of their authority in conducting a search. *See* 19 U.S.C. § 482. Even if this were not so, we would be compelled to find that the customs officials acted within the scope of their authority.

Bernitta's legal theory suggests that it is the likelihood of legal entry which triggers a customs agent's right to search. Such an argument has no logical stopping point. More, under it every smuggler who is stopped and questioned prior to actual entry could simply elect to return to his port of origin with impunity to return another day.

Because we conclude that the customs agent's search was reasonable, the judgment of the district court is affirmed.

AFFIRMED.

---

1. The facts indicate that Bernitta was to leave New Orleans on October 17, to fly to Miami, Florida, and from Miami, Florida, he was to depart on October 18, 1982, and fly back to his port of origin.