**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mikal Habeeb AMUNY, a/k/a James Anderson, a/k/a Jim Waters, and a/k/a Wayne Roberson, George Ellis Gaston, and Royce David Hebert, Defendants-Appellants.**

**No. 84–2376.**

United States Court of Appeals,
Fifth Circuit.

July 29, 1985.

Rehearing and Rehearing En Banc
Denied Oct. 2, 1985.

Robert Madden Hill, Circuit Judge, filed special concurring opinion.

Dick DeGuerin, Houston, Tex., for Amuny.

Richard Thornton, Galveston, Tex., for Gaston.

Gerald H. Goldstein, San Antonio, Tex., for Hebert.

Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., for U.S.

Before WISDOM, WILLIAMS and HILL, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Mikal Habeeb Amuny, a recent visitor to this Court,[1] and his two confederates challenge the search and subsequent seizure of 550 pounds of marihuana found on board a private aircraft in which they had completed a flight. They also challenge their federal prosecution, since a state court had concluded that the search was unconstitutional and had suppressed the fruits of that search. We find that in their zeal to enforce the narcotics laws the officers conducted an unconstitutional search. We therefore reverse the district court's denial of the appellants' motion to suppress.

## I. BACKGROUND

A. *The Investigation, Arrests, and Search*

In mid-May 1980, a non-uniformed officer of the United States Customs Service, Henry Castro, was investigating an unrelated matter at Scholes Field Airport in Galveston, Texas. He noticed an individual acting somewhat furtively. Castro watched this individual exit an automobile, walk over to a twin-engine Beechcraft Bonanza model airplane, and continually look around the airport, particularly at the terminal building, as he examined the airplane. Castro transmitted the license plate number of the automobile to a radio dispatcher and received a report that the car was registered to appellant Amuny, a resident of Austin, Texas. The report also indicated that Amuny had two previous drug arrests, one in Austin and another in Port Arthur, Texas.

Castro investigated the matter further. He obtained a photograph of Amuny from the Port Arthur Police Department, which confirmed that Amuny was the person he saw acting suspiciously at the airport. A

---

1. *See United States v. Antone,* 753 F.2d 1301, *rehearing denied sub nom. United States v. Amuny,* 758 F.2d 651 (5th Cir.1985), *petitions for cert.* *filed,* 53 U.S.L.W. 3826 & 3839 (U.S. May 21 & 28, 1985) (Nos. 84–1748 & 84–1812).

check of the registration information of the aircraft Amuny had been inspecting revealed that in April 1979, it had been sold to a "Jim Waters", who purported to reside in Houston. Officer Castro then learned from Customs Service and Treasury Department intelligence sources that Amuny had used three aliases in the past, one of them being "Jim Waters". Local airport personnel told Castro that the tie-down fees and servicing costs for the plane had been paid in cash or cashier's checks by an individual named "James Anderson". The physical description of Anderson given by the airport manager and a mechanic matched Amuny. On June 10, 1980, the mechanic contacted Castro and advised Castro that Amuny had returned to the airport, requested the mechanic to perform work on the brakes of the aircraft, and had said that soon he would be using the aircraft. Castro conveyed this information to the Drug Enforcement Agency (DEA) and local law enforcement officers.

DEA agent Lewis Richenberger then prepared an affidavit seeking authorization to install an electronic tracking device, commonly known as a beeper, in the interior of the airplane. The affidavit stated that (1) Amuny had stared suspiciously at a non-uniformed officer (Castro) at the airport; (2) Amuny was "documented" with federal intelligence sources as a smuggler of drugs by air; (3) another aircraft that was registered to a "Wayne Roberson", an alleged alias of Amuny, transported marihuana and was seized by Customs authorities approximately one year earlier; (4) Amuny had used an assumed name; (5) Amuny had paid certain fees related to the airplane's maintenance in cash; and (6) Amuny had failed to maintain a current safety inspection authorization for the aircraft. A federal magistrate signed the authorization, and the beeper was installed.

Monitoring the beeper revealed that on two occasions the aircraft traveled from Galveston, Texas, to the Palacios, Texas

area, a town on the coast of the Gulf of Mexico.[2] On both occasions, the agents monitoring the plane lost track of the plane around Palacios. The first such trip occurred on June 19, 1980. The plane departed from and returned to Scholes Field in Galveston on the same day. After the plane returned to Scholes Field, the three appellants (Amuny, George Gaston, and Royce Hebert) alighted from the plane, went into a nearby hangar, and transported some boxes from the hangar to the airplane. Officers observing their actions could not determine whether the appellants were carrying "equipment or groceries or extra fuel or anything else." The group then departed by car, leaving the plane at Scholes Field.

The next morning the appellants returned to the airport. Agents monitoring the aircraft witnessed Amuny and Hebert load a bucket of the Colonel's world-famous chicken and a styrofoam cooler into the plane. Amuny and Hebert then flew away. Again, customs officers lost track of the aircraft around Palacios. Unlike the flight on the previous day, however, the appellants did not return to Scholes Field that day. Since the agents lost track of the craft, they did not know where the plane had landed that day, and they had no information about a point of origin for a return flight. The next morning, June 21, 1981, the agents who were monitoring the plane electronically picked up the beeper signals near Palacios, Texas. The agents determined that the plane was traveling northeast toward Scholes Field.

Shortly before the aircraft arrived at Scholes Field, Gaston arrived at the airport. After the plane had landed, and Amuny and Hebert had disembarked from the aircraft, approximately one dozen non-uniformed state and federal officers converged on the aircraft and the appellants in six unmarked automobiles. Apparently, several of the officers approached the aircraft with their weapons drawn. The three

2. By air, Palacios is located approximately 95 miles southwest of Galveston and 200 miles northeast of the United States-Mexico border.

appellants fled but were quickly captured, handcuffed, and placed in a seated position some distance from the aircraft.

Officer Castro then approached the airplane. By visual search alongside the aircraft, he could see only packages pressed against the closed and curtained side windows of the craft. Since the plane stood very high off the ground, it was impossible to look through the uncurtained front windshield and see the interior of the craft. Officer Castro, therefore, climbed onto the wing of the aircraft, which was approximately four feet above the pavement, moved to the front edge of the wing, leaned across the nose of the plane, and looked through the front windshield. From that vantage point, he was able to see several packages wrapped in brown paper and encased in plastic. Castro later stated at a state court suppression hearing that based upon his experience as a customs officer he believed that the packages contained contraband. He acknowledged, however, that he did not detect any odor of marihuana emanating from the plane. Shortly thereafter, still without a search warrant, the officers opened the doors of the plane, entered the craft, and removed and opened the packages. The record is in conflict as to whether or not the passenger door of the aircraft was locked. The packages were found to contain marihuana.

### B. *Proceedings Below*

Immediately after the arrest and search, the federal and state officers involved met with Assistant United States Attorney George Jacobs, who at the time bore responsibility for prosecuting all drug-related cases in the Southern District of Texas. Since a federal magistrate had issued the warrant to install the beeper and federal agents had coordinated the investigation, policy and procedure of the Justice Department ordinarily required that such a case be tried in a United States District Court. The officers involved in the investigation and arrest, however, indicated to Jacobs that they preferred prosecuting this case in state court. Jacobs agreed, and federal agents relinquished custody of the appellants and filed no federal charges against them.

The appellants were then indicted in State District Court, Galveston County, Texas. The appellants moved to suppress the warrantless search of the aircraft and the resulting seizure of the marihuana. The State District Court found the warrantless search unlawful, ordered the suppression of the evidence, and dismissed the case. The federal agents then brought the case back to Assistant United States Attorney Jacobs. After presenting the evidence to a federal grand jury, Jacobs recommended to the members of that grand jury that they decline to indict the appellants. The grand jury followed Jacobs's recommendation.

No further action was taken until some two years later when, without prior Justice Department approval, another Assistant United States Attorney presented the case to another federal grand jury which returned the indictments before us.

In the district court, the appellants moved to dismiss the indictments because (1) the federal government was seeking to prosecute them for crimes occurring over three years earlier, (2) a state court had granted their suppression motion, and (3) one federal grand jury had declined to indict. Alternatively, the appellants moved to suppress the introduction of the marihuana, arguing that the magistrate lacked probable cause to authorize the installation of the beeper and that the warrantless search of the aircraft was unlawful. The district court denied both motions,.and the appellants entered conditional guilty pleas under Fed.R.Crim.P. 11(a)(2). The appellants raise the same challenges in this appeal.

## II. THE APPELLANTS' MOTION TO DISMISS THE INDICTMENTS

The appellants challenge the district court's refusal to dismiss the indictment on three grounds. They claim that the government's conduct violated the so-called

*Petite* policy, their due process rights, and the Speedy Trial Act.

## A. *The* Petite *Policy*

██ The *Petite* policy is a Department of Justice policy that bars a variety of successive prosecutions stemming from the same criminal conduct or acts. *See Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). The policy forecloses, in part, a federal prosecution following a state prosecution for the same act or acts, unless the federal prosecution is necessary to advance compelling interests of federal law enforcement. *Rinaldi v. United States,* 434 U.S. 22, 28, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977). The policy was created in response to the "fairness implications of the multiple prosecution power" but is not commanded by the Constitution. *Id.* at 28 & 29, 98 S.Ct. at 84 & 85. Before a United States Attorney commences a federal prosecution when the policy attaches, that attorney must obtain prior authorization to prosecute the suit from the appropriate United States Assistant Attorney General. *Id.* at 24 n. 5, 98 S.Ct. at 82 n. 5.

The appellants argue that the federal prosecutor who secured their indictments violated the *Petite* policy because she failed to procure prior approval from an Assistant Attorney General before she initiated this suit. The initial question in this case is whether the policy even is applicable, since the appellants were never tried in the state court. This Court has twice addressed claims such as the appellants', and in both cases concluded that the *Petite* policy did not apply.

In *United States v. Nelligan,* 573 F.2d 251, 255 (5th Cir.1978), the defendant having successfully challenged a state indictment on state speedy trial grounds asserted that the dismissal of his state suit foreclosed his later federal prosecution for the same unlawful conduct. This Court rejected the argument. It recognized, of course, that while the policy was not constitutionally mandated, it was created because of the twin concerns over the proper allocation of limited prosecutorial resources and the un-

fairness associated with multiple prosecutions for the same criminal conduct. The court found, however, that a defendant who had not endured a full trial in state court could not demonstrate the requisite unfairness that warranted the application of the *Petite* policy. In pertinent part the court stated: "The failure of the state to try [a] defendant and decide his guilt or innocence does not preclude the federal government from determining whether a defendant has violated a federal statute proscribing the same conduct." *Id.* at 255; *accord United States v. Fossler,* 597 F.2d 478, 483 (5th Cir.1979).

██ Like Nelligan and Fossler, the appellants in this case never endured the burden of a state court trial that determined their guilt or innocence. Since the state proceedings had been aborted prior to a trial on the merits, the *Petite* policy did not apply and the appellants' federal prosecution was proper.

## B. *Due Process Violation*

██ The appellants next argue that the government's delay in securing this indictment violated their due process rights. In *United States v. Lovasco,* 431 U.S. 783, 795 & n. 17, 97 S.Ct. 2044, 2051 & n. 17, 52 L.Ed.2d 752 (1977), and *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971), the Supreme Court recognized that the due process clause may provide a criminal defendant with some protection against overly stale claims if the defendant can establish that (1) the prosecutor intentionally delayed indicting him to gain a tactical advantage *and* (2) the defendant incurred actual prejudice as a result of the delay. The defendant bears the burden of proving both elements. *United States v. Townley,* 665 F.2d 579, 581 (5th Cir.) (prejudice element), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Hendricks,* 661 F.2d 38, 40 (5th Cir.1980) (bad motive element). In this case the appellants did not even allege, let alone sustain their burden of proof, that the government intentionally delayed in-

dicting them to gain a tactical advantage. In the absence of such a challenge, the appellants failed to state a claim for the violation of their due process rights.

## C. *Speedy Trial Act*

In another vague argument, which comprises one paragraph of their fifty-page brief, the appellants claim that the district court erred in refusing to dismiss their indictments for alleged violations of the Speedy Trial Act, 18 U.S.C. §§ 3161 to 3174 (1982). The appellants do not suggest how federal authorities violated the Act or even what section of the Act was violated. Instead, they merely assert that under the totality of circumstances it is apparent that the Act has been violated. We assume for the purpose of this appeal that the appellants are claiming that since federal officers orchestrated the investigation and were responsible primarily for their arrests, the clock for federal speedy trial purposes began to run when they were arrested.

18 U.S.C. § 3161(b) identifies the applicable time period within which federal prosecutors must file an indictment after they arrest a defendant. In pertinent part, this section states:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

The key question in this case is whether the federal government's dual decisions to release the appellants immediately and unconditionally after the arrests and to decline preferring criminal charges against them at that time render section 3161(b) inapplicable to their case.

The Seventh Circuit recently analyzed this precise issue. In *United States v. Janik*, 723 F.2d 537 (7th Cir.1983), federal and state law enforcement officers orchestrated an investigation that led to the defendant's arrest, which was consummated by officials from both sovereignties. Immediately after the arrest, state officials retained custody and preferred charges, and the federal agents relinquished custody and did not pursue the matter further at that time. Subsequently, state prosecutors voluntarily dismissed the state case, and the federal officials sought to prosecute the defendant for the violation of similar federal laws. The defendant claimed that since the federal authorities did not indict him within thirty days after they had arrested him, his federal prosecution was barred by 18 U.S.C. § 3161(b). The Seventh Circuit rejected this argument, holding that 3161(b) did not apply when the defendant had been released from federal custody and federal charges had not been levied. The court found that the primary purpose of the Act was to implement the defendant's Sixth Amendment right to a speedy trial, a right designed to limit the time during which *criminal charges* remain hanging over a person's head unresolved. The court found that that purpose was not served where federal authorities acted in the manner in which they had in that case. Other courts have adopted similar rationales.[3]

We agree with these cases and conclude that even if federal officials arrest a defendant, 18 U.S.C. § 3161(b) does not apply if federal officials in good faith immediately and unconditionally release the defendant and prefer no federal criminal charges against him. Although federal officials were involved intimately in the appellants' arrests, they relinquished control over the appellants shortly after the arrest and immediately after consulting with the federal prosecutor, and they did not file any criminal charges against the

---

3. *See United States v. Sanchez*, 722 F.2d 1501, 1509 (11th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Maruska*, 717 F.2d 1222, 1223 (8th Cir.1983); *United States v. Alfarano*, 706 F.2d 739, 741 (6th Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Candelaria*, 704 F.2d 1129, 1132 (9th Cir.1983); *United States v. Sayers*, 698 F.2d 1128, 1131 (11th Cir. 1983); *United States v. Jones*, 676 F.2d 327, 331 (8th Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982).

appellants at that time. This conduct did not violate the appellants' federal speedy trial rights.

## III. THE APPELLANTS' MOTION TO SUPPRESS

■ In the appellants' remaining argument on appeal, they level two distinct challenges against the district court's failure to grant their motion to suppress—(1) the magistrate lacked probable cause to issue the order authorizing the government agents to install the beeper and (2) the government agents lacked any basis to either arrest the appellants or search their airplane. Because we conclude that the beeper produced no evidence of any criminal conduct and only evidence favorable to the appellants, we need not address the merits of the appellants' first challenge.[4] *See United States v. Worthington*, 544 F.2d 1275, 1281 (5th Cir.) (defendant could not challenge allegedly illegal installation of a beeper in his plane where beeper malfunctioned shortly after installation and the beeper's use produced no evidence whatsoever), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977). *But see* Fishman, *Electronic Tracking Devices and the Fourth Amendment:* Knotts, Karo, *and the Questions Still Unanswered*, 34 Cath. U.L.Rev. 277, 315, 363, 370 & n. 470 (discussing whether, in light of recent Supreme Court precedent, Fourth Amendment authorizes the installation of a beeper based upon only a showing of reasonable suspicion rather than probable cause). We

nevertheless find merit in the appellants' second argument and hold that the district court should have suppressed the fruits of the warrantless search of the aircraft.

### A. *Standing to Challenge the Search and Seizure*

Before we discuss the merits of the appellants' search and seizure claim, we must address an issue that has arisen with disturbing regularity in this circuit—the government's failure to raise in the district court its claim on appeal that the appellants lack standing to challenge the allegedly illegal search and seizure. *See, e.g., Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). In this case, the government not only failed to raise in the district court the standing issue but expressly conceded that the appellants possessed the requisite standing.[5]

Consistent with the ordinary rule of appellate procedure, we usually will not entertain a claim raised for the first time on appeal. *See Self v. Blackburn*, 751 F.2d 789, 793 (5th Cir.1985); *United States v. Parker*, 722 F.2d 179, 183 n. 2 (5th Cir. 1983). And we have rejected repeatedly the government's standing challenges where the government failed to raise the issue before the district court. *See United States v. Mendoza*, 722 F.2d 96, 97 n. 1 (5th Cir.1983); *United States v. Hultgren*, 713 F.2d 79, 83 n. 6 (5th Cir.1983); *United States v. Sanchez*, 689 F.2d 508, 509 n. 1

---

**4.** The use of the beeper in this case did not disprove the appellants' story that they had not crossed the international border during their excursions. Federal agents monitoring the beeper testified that they had twice lost track of the plane near the Palacios, Texas area, which is only 95 miles southeast of Galveston and approximately 200 miles from the United States-Mexico border. This testimony undermined the government's claim that the appellants traversed the international border. Whether the appellants crossed the border was a critical issue, since the federal agents who subsequently searched the aircraft would have had authority to search the craft without probable cause if they possessed a reasonable certainty that the plane had crossed the border. *See, infra,* at 1122–1123; *United States v. Niver,* 689 F.2d 520,

526 (5th Cir.1982). The district court specifically found that the government failed to satisfy its burden of proving that the plane had crossed the border. The government's use of the beeper aided rather than aggrieved the appellants.

**5.** Appellant Amuny's counsel informed us in his brief and at oral argument that in the district court the appellants were prepared to present proof related to their reasonable expectations of privacy in the aircraft but the government explicitly conceded that the appellants possessed standing to raise their challenges to the government's search and seizure. The government never challenged this assertion in its brief or at oral argument.

(5th Cir.1982); *see also United States v. Settegast,* 755 F.2d 1117, 1119 n. 2 (5th Cir.1985). We have assumed, as all of the parties did in the district court, that the defendants had standing to raise their challenges.

 In this case, however, the government's conduct constitutes something more than mere waiver. Here the government induced the appellants to forego the opportunity in the district court to establish their legitimate expectations of privacy in the aircraft, the essential element to prove standing. The government in this appeal seeks to have this Court decline deciding the merits of the appellants' appeal because it claims that these appellants failed to establish the requisite nexus between their personal privacy interests in the aircraft and the government's assertedly illegal activity. We reject this belated claim by the government and hold that it forfeited its opportunity to challenge the appellants' standing. *See Steagald v. United States,* 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981) (The government may lose its right to raise on appeal the issue of the defendant's standing *"when it has made [a] contrary assertions in the court[] below,* when it has acquiesced in contrary findings by that court[], or when it has failed to raise such [a] question[] in a timely fashion during the litigation."— emphasis added).

B. *The Warrantless Search of the Appellants' Plane*

 We turn, finally, to the merits of their Fourth Amendment claim. The appellants argue that the agents who arrested them and conducted the warrantless search of the airplane lacked probable cause to either arrest them or search the aircraft. During the suppression hearing before the district court, federal agents involved in

the investigation, arrests, and search conceded that when the plane landed at Scholes Field on June 21, 1980, the day of the arrests and search, they lacked probable cause to believe that the airplane contained contraband. When the plane landed, however, they believed that they had authority to search the plane without a showing of probable cause because they suspected that the plane had crossed the international border. Alternatively, they claim that at that time they possessed reasonable suspicion to conduct an investigative stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* authorizes law enforcement officers, consistent with the Fourth Amendment, to stop a person and detain him briefly for routine questioning when they have reasonable suspicion to believe that the person may be engaging in criminal activity. *See also United States v. Hensley,* —— U.S. ——, ——, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985) (extending *Terry* to situations involving completed crimes); *United States v. Shaw,* 701 F.2d 367, 377 n. 4 (5th Cir. 1983) (reasonable suspicion to conduct a *Terry* stop is to be considered by the totality of circumstances, including the collective knowledge of all officers involved in the investigation), *cert. denied,* —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984).

The government urged the district court to uphold the legality of the search based upon any one of three separate theories: (1) the search of the plane was a "functional equivalent of the border search", which does not require a showing of probable cause; (2) the appellants' flight from the area of the plane as the agents approached ripened the agents' reasonable suspicion to conduct a *Terry* stop into probable cause to believe that the plane contained contraband; and (3) Agent Castro observed the contraband in plain view.[6] The district

---

6. The government did not attempt to claim that the search of the airplane was incident to the lawful arrest of the appellants. *See, e.g., New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1982). For reasons not entirely apparent from the record, Agent Castro insisted that the appellants were not arrested until after

the plane was searched. Castro conceded, however, that after the appellants were tracked down by the dozen agents riding in the automobiles, the appellants were "secured"; that is, they were handcuffed with their hands behind their backs and were placed in a seated position, under guard, some distance from the plane.

court rejected the first argument but held that "an assessment of the totality of the facts and circumstances and the reasonable inferences which flow therefrom—including Amuny's and Herbert's [sic] flight from the scene—warranted a reasonably prudent person to conclude that the aircraft contained contraband." Apparently the district court did not consider the government's plain view claim. We address in turn each of these proffered reasons to support the search.

### 1. *Functional Equivalent of the Border*

The federal agents who testified at the state and federal court suppression hearings candidly stated that they had intended to converge upon and search the airplane the moment the appellants alighted from the plane. These officers further revealed that they believed that they had such authority because they suspected that the plane had crossed the international border.

■■■■ The officers, however, were incorrect in their belief about the governing legal standard. It is well-settled that federal authorities may search vehicles or persons without a showing of probable cause at either the border or "functional equivalent" of the border. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). The functional equivalent of the border includes the place at which an international flight first arrives in the United States. *Almeida-Sanchez*, 413 U.S. at 273, 93 S.Ct. at 2539; *United States v. Cascante-Bernitta*, 711 F.2d 36, 38 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 252, 78 L.Ed.2d 239 (1983); *United States v. Niver*, 689 F.2d 520, 527 (5th Cir.1982). To justify a search at the functional equivalent of the border, agents must demon-

strate to a "reasonable certainty" that the vehicle has, in fact, crossed the international border. *See Niver*, 689 F.2d at 526; *see also United States v. Barbin*, 743 F.2d 256, 261 (5th Cir.1984); *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir.1984). We have described the reasonable certainty test to require something more than a showing of probable cause but something less than proof beyond a reasonable doubt. *Niver*, 689 F.2d at 526; *see also United States v. Garcia*, 672 F.2d 1349, 1363 (11th Cir.1982); *United States v. Driscoll*, 632 F.2d 737, 739 (9th Cir.1980).

This Court has held that federal agents possessed the requisite reasonable certainty where they had initially detected an aircraft over foreign territory and electronically tracked that aircraft traversing the international border. *See Niver*, 689 F.2d at 523 & 526; *United States v. Flynn*, 664 F.2d 1296, 1306 & n. 17 (5th Cir.), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982); *United States v. Stone*, 659 F.2d 569, 572 (5th Cir.1981). We do not suggest that this is the only manner in which the reasonable certainty requirement may be satisfied. In *Barbin, supra*, although customs officers personally did not observe the vehicle cross the border, the reasonable certainty requirement was met because of a variety of circumstantial evidence, including two tips from a reliable informant. 743 F.2d at 261. We stress that the reasonable certainty requirement is a high standard and one which cannot be met based upon mere suspicions or possibilities.

Here the federal agents, in fact, conducted the search of aircraft because of their mere suspicion that the plane had crossed the border. In this appeal, the government insists that the facts the agents possessed at the time they searched the plane satisfy the reasonable certainty test. The three key facts the government claims are dis-

---

Agent Castro stated that the appellants were not arrested at this time. Apparently, no agent either formally told the appellants they were arrested or gave them *Miranda* warnings until after the agents searched the plane. In any

event, since the government did not argue that the search was authorized as being incident to a lawful arrest, we need not decide whether the appellants' pre-search seizure constituted a lawful arrest.

positive are: (1) when Amuny and Hebert departed Scholes Field on June 20, 1980, they loaded a bucket of fried chicken and an ice chest into the plane, (2) they had refueled the plane before they took off, and (3) the plane did not return until the following day. These facts, taken individually or collectively, are no more indicative of drug traffickers flying to Central or South America to pick up contraband than of persons taking a one day outing in the United States. Indeed, Agent Castro conceded at the federal court suppression hearing that the appellants' plane could have landed at any one of a number of small, isolated airstrips near Palacios, and this fact would explain why the agents were unable to track the craft beyond the Palacios area. These proffered additional facts certainly do not demonstrate to the requisite reasonable certainty that the appellants' plane crossed the border.

■ In essence, the government urges us to conclude that it satisfied the reasonable certainty test by proving that the appellants had *an opportunity* to cross the international border. We have rejected this argument. *See United States v. Brennan,* 538 F.2d 711, 715 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). Proof that a vehicle had a mere opportunity to cross the border is not adequate. As the district court found, therefore, the government did not satisfy its burden of proving to a reasonable degree of certainty that the plane had crossed the international border, and the warrantless search of the plane cannot be sustained based upon the functional equivalent of the border doctrine.

2. *The Appellants' Flight From the Scene*

The government also argues, and the district court specifically found, that when the appellants ran away from the scene this act raised their reasonable suspicion to probable cause and justified the subsequent search and arrests. Even if we assume that the agents possessed reasonable suspicion to conduct a *Terry* -type investigative stop when the government agents converged en mass upon the appellants, we find that the appellants' flight did not raise that reasonable suspicion to a level of probable cause.

If a police officer identifies himself while approaching a suspect and the suspect flees, the suspect's conduct suggests that he knowingly seeks to evade questioning or capture. *See United States v. Costner,* 646 F.2d 234, 236 (5th Cir.1981); *United States v. Martinez-Gonzalez,* 686 F.2d 93, 100 (2d Cir.1982). Such conduct ordinarily supplies another element to the reasonable suspicion calculus, *see United States v. Pope,* 561 F.2d 663, 668 & 669 (5th Cir. 1977), but may occasionally serve as the catalyst to convert mere reasonable suspicion to probable cause. *Costner,* 646 F.2d at 236; *United States v. Vasquez,* 534 F.2d 1142, 1145 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Martinez-Gonzalez,* 686 F.2d at 100. In cases where investigating officers do not identify themselves, however, flight alone is, at best, ambiguous conduct. In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court recognized that "when an officer insufficiently or unclearly identifies his office or his mission, the [person's] flight from the [site of confrontation] must be regarded as ambiguous conduct." *Id.* at 482, 83 S.Ct. at 414 (citing *Miller v. United States,* 357 U.S. 301, 309, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) ). In *United States v. Jones,* 619 F.2d 494, 498 (5th Cir.1980), this Court noted that a defendant's "evasive actions and flight from two strange men riding in an unmarked car and exhibiting no indicia of lawful authority were only natural reactions to the circumstance."

■ Like the courts in *Wong Sun* and *James,* we view the appellants' flight from the scene of the plane as ambiguous conduct and insufficient to support a finding of probable cause. The testimony from the two suppression hearings reveals that six unmarked vehicles carrying approximately twelve plainclothes law enforcement offi-

cers converged, in unison, upon the site of the aircraft. None of the vehicles had sirens blaring or lights flashing, and the officers did not announce either their purpose or identity in any other way. Some of the officers apparently had their weapons drawn. Flight under these circumstances was as much reasonable as it was suspicious. It added nothing to the officers' determination of probable cause. We therefore reject the government's claim that the appellants' flight from the area of the plane supported their determination of probable cause. The search of the aircraft cannot be sustained upon this basis.

## C. *The Plain View Doctrine*

In its final plea for upholding the warrantless search of the aircraft, the government argues that the search was justified because Agent Castro observed what he believed to be contraband in plain view. Because we conclude that Agent Castro's climbing onto the wing and garnering an otherwise unavailable view through the front windshield constituted an unlawful search, the plain view doctrine does not apply.

Three facts must exist before the plain view doctrine authorizes a warrantless search and seizure.

> First, the police officer must lawfully make an 'initial intrusion' or otherwise properly be in a position from which he can view a particular area.... Second, the officer must discover incriminating evidence 'inadvertently,' which is to say, he may not 'know in advance the location of [certain] evidence and intend to seize it,' relying on the plain view doctrine only as a pretext.... Finally, it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983) (plu-

rality opinion) (brackets in opinion) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion)); *see also Washington v. Chrisman*, 455 U.S. 1, 5, 102 S.Ct. 812, 816, 70 L.Ed.2d 778 (1982). This Court has repeatedly and consistently applied these three criteria when evaluating the propriety of a search under the plain view exception to the warrant requirement.[7]

The critical issue in this case involves the first requirement of the plain view doctrine—that is, whether Agent Castro had a legitimate right to climb onto and walk upon the wing, lean across the nose of the plane, and peer through the front windshield and into the interior of the craft. The government concedes that Agent Castro's presence on the wing was a technical trespass but does not concede that this fact means that Castro was not legitimately in a position from which he could view the interior of the plane. Citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the government insists that Castro's trespass is irrelevant to the determination of whether he was properly in a position to view the contraband and argues that the appropriate inquiry is whether Agent Castro's conduct invaded any of the appellants' legitimate expectations of privacy in the aircraft. In *Katz*, the Supreme Court abandoned the long-extant rule that police officers may properly secure incriminatory evidence only if there has been no physical invasion or trespass upon a suspect's property. Emphasizing the frequently quoted phrase: "the Fourth Amendment protects people, not places," *id.* at 351, 88 S.Ct. at 511, the Court, instead, articulated the "reasonable expectation of privacy" test to determine whether governmental conduct constitutes an unconstitutional search or seizure. *Id.* at 353, 88 S.Ct. at 512; *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

---

7. *See United States v. Marbury*, 732 F.2d 390, 399 (5th Cir.1984); *United States v. Hultgren*, 713 F.2d 79, 88 & n. 12 (5th Cir.1983); *Vance v. United States*, 676 F.2d 183, 189 (5th Cir.1982); *United States v. Jonas*, 639 F.2d 200, 203 (5th Cir.1981); *United States v. Antill*, 615 F.2d 648, 649 (5th Cir.), *cert. denied*, 449 U.S. 866, 101 S.Ct. 200, 66 L.Ed.2d 85 (1980).

We agree with the government that to determine whether Agent Castro was in a place where he had a lawful right to be we must focus upon whether Castro's conduct invaded the appellants' legitimate expectations of privacy in the aircraft. Contrary to the government's vigorous assertion, however, we find that the character of Agent Castro's trespass is highly critical in determining whether the government invaded the appellants' privacy expectations. Our guidance comes from *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In that case, the Court said:

> Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such interest. These ideas were rejected both in *Jones [v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 1960)] and *Katz [v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)]. *But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment.* No better demonstration of this proposition exists than the decision in *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), where the Court held that an individual's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations.

*Id.* at 143 n. 12, 99 S.Ct. at 430 n. 12 (emphasis added).

In a similar vein, in cases decided subsequent to *Katz*, we have on several occasions commented upon the effect of a governmental trespass on (1) a suspect's legitimate expectation of privacy and (2) the operation of the plain view doctrine. In *United States v. Davis*, 423 F.2d 974 (5th Cir.), *cert. denied*, 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970), for example, FBI agents returned at night to the home of the defendant where a shootout with FBI agents had occurred earlier that day. Without possessing a warrant, the agents searched for and recovered a gun that the defendant had thrown in his yard. The government argued that no search was conducted, since the gun was found in plain view. This Court disagreed, finding the plain view doctrine inapplicable. Without expressly analyzing the defendant's privacy interest in his own home and yard, we concluded that the agents' conduct constituted an unconstitutional search in the "classic sense." *Id.* at 977. We accordingly held that the plain view doctrine was inapplicable "where the observing officer has physically invaded a constitutionally protected area in order to secure the view." *Id.* For purposes of illustration, the *Davis* court indicated that the plain view doctrine typically applies in cases involving the recovery of evidence from automobiles parked in public places. The court explained:

> The rule lends itself to application in these situations because the observing officer is not required to trespass on private property in order to have a clear view of the articles inside an automobile. However, where police officers trespass in order to secure the view, we have not hesitated to find a search.

*Id.* (footnotes omitted).

In *United States v. Arredondo-Hernandez*, 574 F.2d 1312 (5th Cir.1978), we further remarked on the significance of the federal officers' trespassing upon a sus-

pect's property to garner a plain view. In that case, a border patrol agent observed from his position alongside a lawfully-stopped pickup truck a secret compartment in the interior of the truck. We concluded that the agent's observation of the compartment established probable cause to conduct a warrantless search of the vehicle under the plain view doctrine. In discussing the first requirement of the plain view doctrine we held: "The structural discrepancy [of the truck] ... was observed by an officer who was lawfully in the place from which the observation was made and who did not know that the discrepancy existed prior to his peering within." *Id.* at 1315. We went on in that opinion and observed:

> This was not an instance where the officer opened the doors in the back of the truck to ascertain whether there were occupants within. *Nor is it an instance of an officer looking through a window from a spot to which he traveled by trespassing on another's property.* [The officer] did no more than look through a window available to any curious passerby and this, and this alone, was a permissible action on his part.
>
> The fact that [the officer], in making his observation, did not have to infringe physically upon the structural integrity of this vehicle, supports our finding that he was lawfully present in the place at the time of the crucial observation.

*Id.* (emphasis added). We also recognized in that case that merely because " 'the policeman may have to crane his neck, or bend over, or squat, does not render the [plain view] doctrine inapplicable, so long as what he saw would have been visible to any *curious* passerby.' " *Id.* at 1314 (emphasis in opinion) (quoting *James v. United States,* 418 F.2d 1150, 1151 n. 1 (D.C.Cir. 1969)); *see also United States v. Jackson,* 588 F.2d 1046, 1053 (5th Cir.), ("[W]e have not hesitated to find an illegal search where the government agent trespasses in order to secure his plain view."), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979).

A trespass does not result always in a Fourth Amendment violation. *See Atwell v. United States,* 414 F.2d 136, 138 (5th Cir.1969) (open fields doctrine). But the limited plain view automobile cases do demonstrate that a government's trespass is usually unreasonable and violative of a legitimate expectation of privacy. Naturally, the more intrusive the trespass, the greater the likelihood that that conduct will violate an individual's privacy expectations. Intrusiveness involves an analysis of at least two distinct factors. The first concerns the physical trespass itself—the more difficult it is for the officers to gain an otherwise unavailable view, the more likely it is that the trespass violated an unsuspecting individual's privacy rights. This presumption may be explained because we neither expect nor tolerate trespasses upon our property, whether the trespassers be private individuals or law enforcement officers.

The second factor we must analyze concerns that nature of the privacy interest individuals possess in the particular place upon which the government agent trespassed. Courts have long recognized that individuals possess differing degrees of privacy depending upon the nature of the area examined. Of course, the Fourth Amendment provides individuals with the greatest protection in their homes. *See United States v. Karo,* —— U.S. ——, ——, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984); *Payton v. New York,* 445 U.S. 573, 585 (1980); *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). In contrast, there is far less protection as to their automobiles. *See United States v. Chadwick,* 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). These decisions reflect the common-sense recognition that an individual's legitimate expectation of privacy erodes when he exposes his personal effects to public scrutiny.

We turn to the first factor. We believe that Agent Castro's boarding the

aircraft was not a casual touching of the aircraft and was a highly intrusive trespass. The twin-engine Beechcraft airplane in which the appellants flew stood high off the ground. Since the appellants had closed the curtains of the side windows of the plane, a person standing on the ground could not see into the craft without physically climbing onto the wing of the plane and peering through the uncurtained windshield.[8] Castro did that. He was able to examine the interior of the plane only after he climbed onto one of the wings, which stood approximately four feet from the ground, traversed the wing and approached the fuselage, and stretched his body across the nose of the plane. This conduct was not a casual trespass. It involved a serious violation of the property and privacy rights of the appellants. Castro's climbing and walking upon the wing could have damaged seriously the exterior of the craft, particularly the flap of the wing upon which Agent Castro initially climbed. Any aircraft owner has the right to stop strangers from climbing and walking on the wings of his or her plane.

■ We also conclude that the nature of the privacy interest at issue in this aircraft warrants finding that the appellants possessed a reasonable expectation of privacy as to the interior of the plane. The appellants' conduct demonstrated that they intended and attempted to maintain their privacy rights in the interior of the aircraft. They curtained all of the windows that would have enabled "any curious passerby" to examine the interior. They closed the passenger door and locked the cargo door. They temporarily parked the plane adjacent the hangar in which the plane

typically was quartered, an area where few if any people regularly passed.

The government urges that the privacy interest the appellants had in this aircraft was akin to that interest an individual has in his or her automobile. But it is substantially broader in the former. Although an automobile and an airplane are similar in that they both are mobile, they share few other attributes with respect to the relative privacy interests the owners of each possesses.[9] In his concurring opinion in *Rakas*, Justice Powell explained that the warrantless search of an automobile based upon probable cause may be justified because an individual had a reduced expectation of the privacy in an automobile as compared with the individual's expectation of privacy in other locations. He identified the following unique features automobiles possess that explain the diminished expectation of privacy people enjoy in them:

> Automobiles operate on public streets; they are serviced in public places; they stop frequently; they are usually parked in public places; their interiors are highly visible; and they are subject to extensive regulation and inspection.

439 U.S. at 154 n. 2, 99 S.Ct. at 436 n. 2 (Powell, J., concurring); *see also Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (plurality opinion) ("A car has little capacity for escaping public scrutiny. It travels through public thoroughfares where both its occupants and its contents are in plain view."). This airplane, unlike the ordinary automobile, (1) had an interior that was not readily visible from the ground, (2) usually was not parked in a place to which the public has access, (3) did not stop frequently, and (4)

---

**8.** Although the front windshield was uncurtained, the record discloses that because of the height of the windshield from the ground and angle of the windshield, it was impossible for a person standing on the ground to see any part of the interior of the plane.

**9.** This is not to say, of course, that an airplane may not fall within the so-called "automobile exception" to the warrant requirement. We have held that it can. *See United States v. Worthington*, 544 F.2d 1275, 1280 (5th Cir.), *cert.*

denied, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977); *see also United States v. Rollins*, 699 F.2d 530, 534 (11th Cir.), *cert. denied*, 464 U.S. 933, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). We suggest, however, that apart from the principal justification supporting the automobile exception—the inherent mobility of the vehicle, *see California v. Carney*, —— U.S. ——, —— & ——, 105 S.Ct. 2066, 2067 & 2069, 85 L.Ed.2d 406 (1985)—the respective privacy interests the owners of each vehicle enjoy is quite different.

was not readily visible while traveling. Although an airplane, like a car, technically travels in the public space, the public space in which each vehicle travels is quite different. A car is driven upon frequently traveled highways and roads where passengers in adjacent cars may have a view of the interior of the car. A plane, by contrast, is flown in relatively sparsely traveled air space where other airplanes do not have a view of the interior of the vehicle.

 In sum, we conclude that Agent Castro's conduct was sufficiently intrusive to violate the appellants' reasonable expectations to be free from persons climbing on the wings of the plane and also their expectations of privacy in the interior of the plane. The actions of the government agent, therefore, constituted an unreasonable search within the meaning of the Fourth Amendment.[10]

## IV. SUMMARY

We conclude that the district court correctly denied the appellants' motion to dismiss their indictments. Since the search of the plane cannot be sustained upon any of the grounds offered by the government, however, we reverse the district court's denial of the appellants' motion to suppress and direct that the district court enter an order suppressing the evidence obtained by the DEA agents in their search of the aircraft. We need not address the appellants' contention that the magistrate lacked probable cause to authorize the installation of the beeper.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

---

**10.** Clinging to the last straw, the government claims that the search would have been authorized under the so-called inevitable discovery doctrine of *Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Under the inevitable discovery doctrine, information or evidence illegally secured in violation of the defendant's constitutional rights need not be suppressed if the government shoulders the burden of demonstrating by a preponderance of the evidence that it would have ultimately or inevitably discovered the information or evidence by lawful means. —— U.S. at ——, 104 S.Ct. at 2509. We have recently stated that for the doc-

ROBERT MADDEN HILL, Circuit Judge, specially concurring:

I concur in the majority's opinion and write here separately only regarding a hesitancy I have concerning the analysis in the majority's opinion of the "intrusiveness" of the trespass of Agent Castro as it bears on the defendants' legitimate expectation of privacy in the airplane involved in this case. It appears that the majority elevates "intrusive" of the trespass in this case to a new criterion, *see* maj. op. at 1126, composed of two elements: (1) the nature and extent of the trespass and (2) the nature of the privacy interest involved. I would resist in canonizing intrusiveness as the test because it seems, at least as a matter of emphasis and semantics, to run counter to the *Katz*'s Court's warning that "the reach of [the Fourth] Amendment cannot turn upon the presence or absence of a physical *intrusion* into any given enclosure." *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967) (emphasis added).

To be sure, the action a government agent takes in effectuating a search is relevant, but only as it bears upon the issue of "whether the person who claims the protection of the [Fourth] Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 401 (1978). "Intrusiveness of the trespass" should not, therefore, encompass the privacy interest of the individual; it is merely a factor to be considered in determining the legitimacy of the interest. The difficulty that an agent goes to in gaining a view

trine to apply "the prosecution must demonstrate both a reasonable probability that the evidence would have been discovered in the absence of police misconduct and that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation." *United States v. Cherry*, 759 F.2d 1196, 1205 (5th Cir.1985). The government has offered no theory suggesting how the agents would have discovered the contraband absent the agents' misconduct. They have failed to sustain their burden of proof that the doctrine applied.

bears on the reasonableness of the expectation of privacy; it should not, however, be an independent factor in "intrusiveness." More precisely, the difficulty of gaining a view depends on the same facts that make up the expectation of privacy calculus, in our case specifically: height of the airplane, curtains on the windows, slipperiness and fragility of the wings, lighting conditions, etc. These conditions may require the trespass, but they also determine how legitimate was the defendants' expectation of privacy.

I think the result reached by the majority could have been more directly reached by holding that: (1) given the conditions, i.e., height of airplane, curtains drawn, etc., the defendants had a legitimate expectation of privacy in the cabin area of the airplane and (2) Castro invaded or intruded upon that expectation by peering into the cabin area. That the conditions required him to clamber up on the wing, thus trespassing, is not really relevant once a legitimate expectation of privacy has been found.

I can with little difficulty envision a similar case in which an agent acquires his view without physically encountering the airplane, for example, by using a stepladder. I can further envision an argument by the government in such a case that from the language in *Amuny* about intrusiveness, since there was no physical trespass, the first *Amuny* factor is not even discussable,[1] whereas I would contend that the case is at least as good for suppression of the search since the individual's expectation of privacy in the cabin area is just as great and just as legitimate regardless of the presence of a trespass.

I add these comments to make clear that in my opinion the ultimate issue in determining whether a Fourth Amendment violation has occurred is whether there has been an invasion of a legitimate expectation of privacy and that intrusiveness of trespass is merely a way of establishing an

invasion in a case where there has been a physical trespass.

---

**1.** Whether the government could so contend with any measure of credibility in the light of *Katz* is entirely another question. It would at least be a true test of the extent of commitment to a "zealous" representation which is experienced in the courtroom on a daily basis.