United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 11, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-30021

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

TIMOTHY D BROWN

Defendant - Appellant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_____

No. 02-30459

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

TIMOTHY D BROWN; CHRISTOPHER MICHAEL BROWN

Defendants - Appellants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_____

No. 02-30514

_____

UNITED STATES OF AMERICA

                        Plaintiff - Appellee

        v.

    KENNETH WAYNE PEARSON; TIMOTHY D BROWN;
    CHRISTOPHER MICHAEL BROWN

                        Defendants - Appellants


***************************************************************


                    _____

                        No. 03-30375
                    _____


    UNITED STATES OF AMERICA

                        Plaintiff - Appellee

        v.

    TIMOTHY D BROWN; ET AL

                        Defendants

    BETTY L S BROWN; TONGULA VEAL

                        Claimants - Appellants
_____

            Appeals from the United States District Court
                for the Western District of Louisiana
                        No. 01-CR-10012-1
_____

Before KING, Chief Judge, and JONES and SMITH, Circuit Judges.

PER CURIAM:[*]

_____

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.


                                2

The defendants were convicted by a jury on various offenses related to their participation in a major drug distribution enterprise. The indictment also included two criminal forfeiture counts, and after trial the district court ordered the subject property forfeited to the United States. The three criminal defendants, together with two claimants to the forfeited property, now appeal. For the following reasons, we affirm.

## I. GENERAL BACKGROUND

These consolidated appeals arise out of the criminal trial of Timothy D. Brown, his brother Christopher Michael Brown, and Kenneth Wayne Pearson in the Western District of Louisiana. Count 1 of the thirteen-count indictment charged all three men with participation in a major drug distribution conspiracy stretching from 1993 to 1999 and encompassing parts of Louisiana and Texas. Other counts of the indictment charged the men with distributing various amounts of crack cocaine on several discrete occasions, charged Timothy Brown with money laundering offenses, and sought the forfeiture of assets connected to the substantive offenses. Pearson was represented by counsel, but the Browns represented themselves at trial. After seven days of trial, the jury found the defendants guilty on all charges, and the trial judge later found for the government on the forfeiture counts. The Browns were each sentenced to life imprisonment, plus additional sentences running concurrently. Pearson, who was

3

charged only on the conspiracy count and one drug distribution count, received a sentence of 336 months.

All three defendants appeal their convictions.  Consolidated with these appeals is the appeal of Betty L. S. Brown and Tongula Veal, who unsuccessfully filed innocent-owner claims on some of the forfeited property.  Timothy Brown, Betty Brown, and Tongula Veal are pro se on appeal.  Facts relevant to each of the various appellants are set forth separately below.

## II. CHRISTOPHER BROWN

Christopher Brown's sole issue on appeal is whether he validly waived his right to the assistance of counsel at trial. We review this question de novo.  United States v. Joseph, 333 F.3d 587, 589 (5th Cir.), cert. denied, 124 S. Ct. 446 (2003).

A.  Relevant facts

At his arraignment on June 7, 2001, Christopher Brown was represented by his own retained attorney, Dele Adebamiji.  A month later, the government filed a motion to disqualify Adebamiji on the ground that he had represented one of the government's cooperating witnesses in a drug prosecution stemming from the same investigation that eventually led to Brown's indictment.  The magistrate judge recommended that Adebamiji be disqualified and that the defendant be ordered to retain new counsel within twenty days of the ruling.  The district judge adopted this recommendation on September 21, 2001.

4

The defendant appeared before the magistrate judge on November 7 without a lawyer and said that he was unaware that he had been ordered to obtain new counsel. The magistrate judge told him that he could apply for court-appointed counsel if he could no longer afford his own. The magistrate judge then ordered Brown to inform the court, within twenty days, of whether he had obtained new counsel or instead intended to represent himself.

The defendant appeared in court again on December 13. He informed the magistrate judge that he wished to file a motion to proceed pro se. The motion stated that Adebamiji had been "unjustly disqualified" and that any court-appointed lawyer would be "working with the government and not in the defendant's best interest." Brown reiterated this suspicion in open court. The magistrate judge told him that a court-appointed lawyer would be chosen by the public defender's office, which was separate from the prosecution, but Brown repeated that he did not want a court-appointed lawyer.

The magistrate judge then engaged Brown in a lengthy colloquy in which the court inquired into Brown's mental health and education,[1] explained the charges and possible sentences Brown would face, told him about the many advantages a lawyer could offer, and warned that Brown would be held to the same

---

[1] Brown said that he had graduated from high school and claimed to have attended a semester of college. He said that he could read and write "very well" and had no mental problems.

5

rules as other parties. Brown admitted at one point during the exchange that he did not know what "voir dire" meant. The magistrate judge asked if Brown was interested in having stand-by counsel appointed, but Brown said that he was not. After recommending to Brown once more that he not represent himself, the magistrate judge stated that he felt Brown had made a knowing, intelligent, and voluntary decision waive his right to counsel.

After resolving a few pretrial motions filed by Christopher and his brother Timothy, who was also proceeding pro se, the case proceeded to trial on January 15.[2] While Christopher's performance was certainly inferior to that of a skilled lawyer, he was not passive. He made a brief opening statement at the beginning of the trial, and most of the government's witnesses were cross-examined by both Browns, though Timothy's cross-examinations were generally longer. Some of Christopher's cross-examinations seriously damaged his own case: for instance, he elicited testimony that implicated the Browns in a killing and other crimes about which the jury would not otherwise have learned. The Browns called over a dozen witnesses in their case, with most of the direct examinations being performed by Timothy.[3] In his own testimony during the defense's case, Christopher made

_____

[2] This opinion will at points refer to the defendants by their first names when useful to prevent confusion.

[3] Pearson, who was represented by counsel, did not call any witnesses.

6

statements about past run-ins with the police that opened the door to cross-examination on numerous prior arrests.  Christopher delivered a closing argument, but he may have cut his argument short in the mistaken belief that his brother would be able to use any leftover time.

On appeal, Christopher Brown is now represented by appointed counsel.

B.  <u>Analysis</u>

The Sixth Amendment gives a criminal defendant the right to conduct his or her own defense, so long as the accused's waiver of the right to counsel is knowing and intelligent.  <u>Faretta v. California</u>, 422 U.S. 806, 835-36 (1975).  For a defendant who will stand trial, this court has required the trial court to engage in a colloquy with the accused in which the judge warns of the dangers of self-representation.  <u>See</u> <u>United States v. Davis</u>, 269 F.3d 514, 518-19 (5th Cir. 2001).  In assessing whether the accused has made a knowing and intelligent waiver, the court must consider all of the circumstances of the individual case, including

> the defendant's age and education, and other background, experience, and conduct.  The court must ensure that the waiver is not the result of coercion or mistreatment of the defendant, and must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right he is waiving.

<u>Id.</u> at 518 (quoting <u>United States v. Martin</u>, 790 F.2d 1215, 1218 (5th Cir. 1986)).

In this case, the magistrate judge engaged in a colloquy with the defendant of the type required by our precedents. The magistrate judge told Brown about the charges that he faced, about the possible sentences, and about the disadvantages of self-representation. The magistrate judge determined that the defendant was mentally competent and had graduated from high school. During the exchange, the defendant repeatedly indicated that he understood the magistrate judge's warnings, and he unequivocally stated that he wished to represent himself.

While Brown does not dispute that the magistrate judge gave him numerous warnings and engaged him in a colloquy that might ordinarily suffice to demonstrate the validity of his decision to proceed pro se, he contends that his situation possesses several special features that distinguish it from the usual case. First, he contends that his inability to understand why the government disqualified his chosen lawyer, together with his suspicions about appointed counsel, effectively coerced him into representing himself.[4] Second, he argues that his lack of basic legal skills shows that his waiver was not knowing and

---

[4] Brown points in particular to the following exchange, which occurred in a pretrial hearing concerning whether the government had provided proper discovery:

TIMOTHY BROWN: I wasn't provided a copy [of the court's discovery order].
THE COURT: Well, your lawyer was, Mr. Brown.
CHRISTOPHER BROWN: You fired my lawyer.
THE COURT: I sure did.

Although not reproduced in Brown's brief, the magistrate judge followed up one line later with, "And for good cause . . ."

8

intelligent.  Third, he points out that some courts have found that the absence of stand-by counsel undermines the validity of a waiver; if stand-by counsel had been available, he contends, the stand-by lawyer might have averted some of his more serious mistakes and could have prevented him from relying too heavily on his co-defendant brother Timothy, who was more culpable.  Upon consideration, these contentions do not persuade us that the district court erred.

Regarding the first argument, it is true that Brown may well have thought that self-representation was the only way to ensure a zealous defense, given the disqualification of his first lawyer and his mistrust of court-appointed counsel.  Brown does not contend that Adebamiji's disqualification was improper, however, and he has not directed us to any cases establishing that a defendant's suspicion of court-appointed counsel makes his waiver of the right to counsel into the product of "coercion."  In fact, the courts not infrequently encounter defendants who object to court-appointed counsel based on the erroneous belief that such an attorney would be in league with the prosecution.  See, e.g., Wise v. Bowersox, 136 F.3d 1197, 1202 (8th Cir. 1998).  The magistrate judge tried to explain that an appointed lawyer would be a public defender or a private lawyer not associated with the prosecution, but Brown persisted in his rejection of appointed counsel.  While Brown's suspicions were to our mind ill-founded, there is no suggestion here that Brown's suspicions were the

product of any sort of mental incompetence. Given Brown's repeated assertions of his desire to represent himself, it would have been _more_ coercive, and possibly violative of <u>Faretta</u>, if the trial judge had rejected Brown's decision and compelled him to accept the services of an unwanted appointed attorney. "To force a lawyer on a defendant can only lead him to believe that the law contrives against him." <u>Faretta</u>, 422 U.S. at 834.

Brown's dismal performance at trial, recounted in some detail in his appellate brief, reveals quite glaringly that his trial would almost certainly have proceeded better had he been represented by a proper lawyer. Nevertheless, this does not mean that he was unable to make a knowing and intelligent waiver. It is instructive that the trial judge in <u>Faretta</u> had refused to let the defendant represent himself because the defendant gave unsatisfactory answers to the judge's questions concerning the hearsay rule and voir dire procedures. <u>Id.</u> at 808-10 & n.3. The Supreme Court, however, was uninterested in "how well or poorly Faretta had mastered the intricacies of" those rules, concluding that "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." <u>Id.</u> at 836. Brown was a poor lawyer, but a defendant who has chosen self-representation cannot thereafter claim that the quality of his or her own defense amounts to a denial of effective assistance of counsel. <u>Id.</u> at 834 n.46.

Brown asserts that his waiver of the right to counsel was suspect because he often relied on his brother Timothy. Timothy was alleged to be the head of the drug ring and was therefore more culpable than Christopher. Because of the two defendants' potentially conflicting interests, joint representation might have been inappropriate, if undertaken by an actual attorney. But any impropriety arising out of Timothy's participation in Christopher's case would simply go to the effectiveness of Christopher's defense. As stated above, that type of claim is not available to defendants who proceed pro se at trial.

Brown is correct that some of the more disastrous aspects of his trial performance might have been averted if stand-by counsel had been appointed. Stand-by counsel can be appointed even over the defendant's objection. McKaskle v. Wiggins, 465 U.S. 168, 184 (1984). Some courts have indicated, as Brown points out, that the availability of stand-by counsel is a factor to be considered in determining whether the defendant's waiver was knowing and intelligent. See United States v. Sandles, 23 F.3d 1121, 1128 (7th Cir. 1994); Strozier v. Newsome, 871 F.2d 995, 998 (11th Cir. 1989). While this circuit has recognized that appointment of stand-by counsel is the "preferred practice," McQueen v. Blackburn, 755 F.2d 1174, 1178 (5th Cir. 1985), we have not explicitly considered it as a factor that can undermine the validity of a waiver. Further, the Constitution does not require the appointment of stand-by counsel even when it is

11

requested, id. at 1178; see also United States v. Bova, 350 F.3d 224, 226-27 (1st Cir. 2003), and here Brown explicitly refused it.

In sum, having considered all of the relevant circumstances, we conclude that Christopher Brown's waiver of the right to counsel was valid under our precedents.

### III. TIMOTHY BROWN

Timothy Brown raises a number of points of error and also joins in those raised by his co-defendants.

A.    Pre-indictment and post-indictment delay

Brown alleges constitutional and statutory violations traceable to pre-indictment and post-indictment delay.  In particular, he argues first that the government violated his right to due process by waiting until 2001 to indict him for a conspiracy that stretched back to 1993.  Brown asserts that because the government delayed for so long, several alibi witnesses could not be located, two trial witnesses could no longer remember events from 1995 that presumably would have been helpful to Brown's case, and pieces of exculpatory evidence (namely security tapes and financial records) have been lost.

Brown also argues that the government violated the Speedy Trial Act and the Sixth Amendment through post-indictment delay. Brown points out that he was indicted and made his initial court appearance in May 2001 but was not tried until January 15,

12

2002——a period that far exceeds the Act's usual seventy-day limit.

Both of these arguments were raised and rejected in the district court.  We review the district court's legal conclusions de novo and its factual determinations for clear error.  United States v. Bieganowski, 313 F.3d 264, 281 (5th Cir. 2002), cert. denied, 123 S. Ct. 1956 (2003).

1.    Due process/pre-indictment delay

Pre-indictment delay can in some cases deprive a defendant of due process of law.  See United States v. Lovasco, 431 U.S. 783 (1977).  This court set out the required showing to establish such a claim in United States v. Crouch, 84 F.3d 1497, 1514 (5th Cir. 1996) (en banc):

> [F]or preindictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose.

Under Crouch, then, the claim has two essential components: the delay must cause prejudice and it must have been undertaken for an improper purpose.  The defendant bears the burden of proving both.  United States v. Amuny, 767 F.2d 1113, 1119-20 (5th Cir. 1985).

Regarding the first prong, we have held that "[v]ague assertions of lost witnesses, faded memories, or misplaced documents are insufficient" to demonstrate actual prejudice.  Id.

13

at 1515 (quoting United States v. Beszborn, 21 F.3d 62, 67 (5th Cir. 1994) (alteration in original)).  In his appellate brief, Brown does name specific persons and pieces of evidence that he claims were lost.  Even if those assertions were sufficiently substantiated, however, at no point in Brown's submissions to this court or the district court has come close to satisfying Crouch's second prong.  Brown has accused the government of tactical delay, but he has never offered any elaboration or evidentiary substantiation for his bare assertion.  We cannot presume that a delay was undertaken for improper reasons, and prosecutors are not constitutionally required to bring charges as soon as they have enough proof to convict, especially in wide-ranging investigations involving multiple defendants.  See Lovasco, 431 U.S. at 792-95.  "[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."  Id. at 796.

   2.   Speedy Trial Act

Under the federal Speedy Trial Act, a criminal defendant's trial "shall commence within seventy days from" the date of the indictment or the defendant's initial court appearance, whichever is later.  18 U.S.C. § 3161(c)(1) (2000).  The seventy-day limit is, however, subject to a list of exemptions, including the time that elapses between the filing of a motion and the hearing on that motion as well as a period (not to exceed thirty days)

during which a matter is under advisement by the district court. Id. § 3161(h)(1).

The vast majority of the 229 days between Brown's initial appearance and his trial were excludable by reason of the pendency of various motions, many of which were filed by Brown himself. Based on our review of the district court's docket sheet, it appears that 38 nonexcludable days elapsed, a figure comfortably within the statutory limit.

3. Sixth Amendment

Brown also appears to assert that the post-indictment delay violated his constitutional, as opposed to statutory, right to a speedy trial. As a recent decision observed, "[i]t will be the unusual case . . . where the time limits under the Speedy Trial Act have been satisfied but the right to a speedy trial under the Sixth Amendment has been violated." Bieganowski, 313 F.3d at 284. In evaluating the constitutional claim, we consider four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay. United States v. Cardona, 302 F.3d 494, 496 (5th Cir. 2002) (citing Barker v. Wingo, 407 U.S. 514, 530-33 (1972)). We generally need not consider factors two, three, and four if the delay is less than a year. United States v. Bergfeld, 280 F.3d 486, 488 (5th Cir. 2002). Here, Brown was indicted and initially appeared in May 2001 and was tried beginning in January

15

2002.  Even were this a sufficient delay to trigger the right, the delay was attributable to the complexity of the case and the numerous pretrial motions, many of which were filed by Brown. This claim is accordingly without merit.

B.    Jurisdictional challenges

Brown contends that the federal government is without jurisdiction to criminalize his conduct because the federal government lacks a general police power.  According to Brown, the federal government's power to regulate private conduct is largely limited to activities that occur on federal property.  Brown is correct that the federal government lacks a general police power, but his argument overlooks the Commerce Clause, which permits Congress to punish the drug offenses charged here on the ground that they affect interstate commerce, even without proving that the particular acts at issue affected interstate commerce.  See, e.g., United States v. Lopez, 459 F.2d 949, 950-53 (5th Cir. 1972) (holding that 21 U.S.C. §§ 841 and 846 are constitutional). The Supreme Court's recent federalism decisions have not changed this result.  See United States v. Brown, 276 F.3d 211, 214-15 (6th Cir. 2002); United States v. Kallestad, 236 F.3d 225, 230 & n.29 (5th Cir. 2000).

Brown also argues that the district court never established its jurisdiction over the case, but this argument is likewise without merit.  The court had jurisdiction by virtue of 18 U.S.C. § 3231, which confers jurisdiction over "all offenses against the

16

laws of the United States." The indictment charged Brown with such offenses. The underlying drug statutes do not include elements that require the government to prove jurisdictional facts, such as a connection with interstate commerce.

C.    Waiver of right to counsel

In addition to raising issues of his own, Timothy Brown joins in the arguments raised by his co-defendants. These shared claims fail for the same reasons discussed elsewhere in this opinion. The only shared issue that requires separate comment as applied to Timothy Brown is the issue whether he made a valid waiver of his right to counsel.

Timothy Brown appeared at his arraignment in June 2001 represented by retained counsel. Over the course of the next few months, his lawyer filed several motions related to discovery and scheduling. In September 2001, Brown filed a motion to proceed pro se, and his lawyer filed a motion to be removed as counsel of record. At the time, trial was scheduled for January 2002.

Brown appeared before the magistrate judge on October 25, 2001, for a hearing on his motion to proceed pro se, as well as hearings on other motions he had filed. The magistrate judge noted that he had previously determined that Brown did not financially qualify for appointment of counsel. The magistrate judge told Brown that defendants have the constitutional right to represent themselves, but that the magistrate judge had to ensure that Brown was making a knowing and intelligent decision to do

so.  At this point Brown stated that he eventually planned to hire a new attorney, but that he wished to represent himself in the meantime.  The magistrate judge offered to postpone the hearing on Brown's several pending motions until he hired a new lawyer, but Brown said that he wanted to argue the motions himself.  The magistrate judge warned Brown that while there was no deadline for Brown to hire a new lawyer, he should "do that immediately if you're going to do it."

Recognizing that Brown might still hire a lawyer to represent him at trial, the magistrate judge nonetheless engaged Brown in a full colloquy very similar to that described earlier with respect to his brother Christopher.  When asked about his education, Brown claimed to have graduated from college (although the pretrial services report indicated that there was no record of him attending college).  Brown also said that he had represented himself before, winning two out of three cases.  The magistrate judge told Brown that stand-by counsel would not be provided because Brown did not financially qualify for any court-appointed attorney.  The magistrate judge concluded by telling Brown to inform the court if and when he hired a new lawyer.

Brown filed a number of pretrial motions and argued them to the court.  He showed an understanding of basic criminal procedure and terminology; for example, he complained that the government had failed to turn over <u>Brady</u> and <u>Jencks</u> material.

Brown never hired a new lawyer or asked to do so but instead represented himself throughout the trial.

Timothy's colloquy with the magistrate judge was substantially the same as Christopher's colloquy, and it likewise satisfies the applicable standards. The factors that complicated the analysis of Christopher's case are not present with respect to Timothy. His waiver of the right to counsel was a fortiori valid.

D. Other issues

Brown additionally alludes to some dozen purported defects in his trial, devoting a sentence or two to each of them. These same complaints were raised in the district court. Even allowing for the liberality with which we construe pro se briefs, see, e.g., United States v. Glinsey, 209 F.3d 386, 392 n.4 (5th Cir. 2000), some of these claims are presented too obscurely to permit a proper evaluation.[5] To the extent that we can evaluate the arguments, none of them presents reversible error based on the record before us. We make the following observations regarding what appear to be the three strongest arguments that are fairly discernable from the briefs and the record.

---

[5] Brown's brief asserts, for instance, that the government held a press conference that generated prejudicial pretrial publicity. The allegedly offending statements and news reports are not part of the record, however, so it is impossible for us to evaluate Brown's claim. Similarly, while Brown complains that the government failed to make required discovery, his appellate brief does not identify which items used at trial should have been disclosed or mount any argument as to those items.

19

First, Brown asserts that the prosecutor misrepresented the testimony of Bertha Woodfox, a cooperating witness. During closing arguments, the prosecutor said that Woodfox testified that she had seen Brown with drugs. Brown made a contemporaneous objection to that characterization of the evidence, which was overruled. Having examined Woodfox's testimony, it appears that Woodfox in fact testified on cross-examination that she had never actually seen either of the Browns with drugs. Nonetheless, Woodfox did testify that she arranged drug deals for the Browns and transported money for them, and other witnesses testified that they purchased drugs from the Browns. Given those circumstances, the prosecutor's misstatement in no way casts doubt on the correctness of the verdict. Since the remarks did not have such an effect, there is no basis for reversal. See United States v. Kelley, 981 F.2d 1464, 1473 (5th Cir. 1993).

Second, Brown contends that one of the jurors was biased against him, as reflected in a racist letter to the editor that appeared in the local paper. The court held a hearing at which the juror and a newspaper employee testified, and the court determined that there was clear and convincing evidence that the juror was not the author of the letter. This finding of fact is not clearly erroneous.

Third, Brown argues that the government acted in bad faith in putting on the testimony of Chadrick McNeal, who (according to Brown) became a police informant in order to get revenge against

20

Brown.  On direct examination, the government elicited testimony that McNeal was a paid informant.  On cross-examination, Pearson's lawyer and the Browns inquired in some detail into McNeal's motives for becoming an informant.  We see no prosecutorial misconduct in presenting the testimony.  It is within the jury's province to make determinations regarding the credibility of witnesses, and the jury was entitled to discount McNeal's testimony if it so chose.

### IV. KENNETH PEARSON

A.  Giglio/Napue violation

Pearson's first argument on appeal is that the government deprived him of his right to due process when it allowed its witnesses to materially misrepresent the terms of their plea agreements.  We review this matter de novo.[6]

1.  Relevant facts

The government's case featured dozens of witnesses, including fifteen cooperating felons.  Pearson asserts that nine of those cooperating witnesses misrepresented the terms of their plea agreements with the U.S. Attorney's Office.  The nine written plea agreements differ in various ways; all but one of them, however, refer to the possibility of "substantial

---

[6]     Pearson argues that de novo review rather than plain error review is proper even though the matter was not raised below.  The government concedes this point, so we exercise de novo review.

21

assistance" sentence departures.[7]  These agreements carefully

state that the government makes no "promises" regarding sentence

reductions.  The agreements were made available to the defense at

trial.

The government began the direct examination of most (but not

all) of its cooperating witnesses by eliciting testimony that the

witness had pleaded guilty and agreed to testify as part of his

plea agreement.  In some cases the direct examination did not

reveal that the witness could receive a reduced sentence for

testifying.  In a few cases the only question related to the

issue of the witness's reasons for testifying was a question

whether the witness had been "promised anything for testifying,"

which the witnesses answered "no."  The government asked other

witnesses more open-ended questions about their understanding of

whether they would receive anything for their testimony; these

witnesses all said that "no promises" had been made, but some of

them did mention the possibility or hope of receiving more

lenient sentences.  On cross-examination, much of which was

conducted by the Brown brothers, the nature of the witnesses'

plea agreements was explored in some detail.  Most of the

---

[7]    Earl Veal's plea agreement does not contain any
provisions referring to cooperation or substantial assistance.
We note that while the plea agreements are attached as an
appendix to the government's appellate brief, only one of them
was put into the record in the district court.  Nonetheless, as
both sides seem content to proceed on this basis, we shall assume
that the attachments to the government's brief are accurate
representations of the cooperating witnesses' plea agreements.

witnesses admitted that they hoped to receive reduced sentences for testifying.

Pearson's brief discusses in some detail the testimony of each of the nine witnesses who, to various degrees, allegedly misrepresented the nature of their federal plea agreements, but only three of those nine witnesses provided testimony that incriminated Pearson (as opposed to his co-defendants). We will therefore summarize in relevant part the testimony of those three witnesses.

The first of them, Sedrick Jackson, provided rather weak testimony against Pearson. Jackson assumed that Pearson bought crack from the Browns because he saw Pearson leave the Browns' store (which operated as a front for the drug enterprise) with the same kind of bag in which Jackson received his crack. He also testified that Timothy Brown told him that Pearson sometimes caused problems by not paying all of the money that he was supposed to pay. Earlier, at the beginning of the direct examination, the government had elicited testimony that Jackson had agreed to cooperate and that "[i]t's a possibility that I may get a downward departure, but nothing was promised to me, as long as I give substantial assistance." The prosecutor asked Jackson if he knew who would make the final decision on whether his sentence would be reduced, and Jackson said he believed it was the judge.

Thurston Washington's testimony began with an admission that he had entered into a plea agreement. When the prosecutor asked him about his understanding of his agreement, he stated that he would probably get the maximum if he did not testify. When asked whether the judge had the final say on his sentence, he said yes. Washington then proceeded to testify that he sold crack for the Browns for about a year. He also testified that he saw Pearson with crack and that Pearson told him that it came from the Browns.

The third witness who both incriminated Pearson and allegedly misrepresented his federal plea agreement was Derrick Ross, who testified that he bought crack from Pearson nine or ten times. The direct examination of Ross spans only a few transcript pages, and the only reference to his status as a cooperating witness was the question, "Has anyone promised you anything to get you [to] testify today?" Ross answered, "No, sir." That he was testifying pursuant to a plea agreement was therefore not revealed on direct examination (though it was explored on cross-examination).

Several other felons also incriminated Pearson, but he does not argue on appeal that the government misrepresented any plea agreement they might have had. At the close of the case, the jury instructions warned the jury to be especially careful in evaluating the credibility of cooperating witnesses.

    2.   <u>Analysis</u>

The Due Process Clause forbids the government from knowingly using or failing to correct false testimony, including testimony about the nature or existence of a cooperating witness's plea agreement.  Giglio v. United States, 405 U.S. 150, 153-54 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Unites States v. Mason, 293 F.3d 826, 828 (5th Cir. 2002).  To prove a violation, the criminal defendant must show that (1) a witness testified falsely, (2) the government knew that the testimony was false, and (3) the testimony was material.  Mason, 293 F.3d at 828.  Testimony is "material" in this context, and thus a new trial is required, "if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  Giglio, 405 U.S. at 154 (internal quotation marks omitted and alteration in original); see also Barrientes v. Johnson, 221 F.3d 741, 753 (5th Cir. 2000).[8]

Pearson's argument on appeal posits two distinct ways in which the government allegedly misled the jury.  The first relates to the terms of the written plea agreements themselves.  The cooperating witnesses' plea agreements are carefully crafted to state that the government may, but is not required to, file a

---

[8]    The government's brief contends that the standard for materiality is whether there is a "reasonable probability that the result would have been different," which in turn means "a probability sufficient to undermine confidence in the outcome." Pearson is correct, however, that Giglio's "any reasonable likelihood" language imposes a somewhat lower burden.  See Barrientes, 221 F.3d at 756 (comparing the different formulations).  In any event, the difference between the formulations is irrelevant in this case.

motion for a substantial assistance sentence departure or reduction; the agreements also warn that the sentencing judge ultimately sets the sentence. Pearson claims that the written agreements themselves misrepresent the true bargain struck with the witnesses, since cooperating witnesses virtually always receive the anticipated reductions, as did the cooperating witnesses in this case. The carefully crafted hedges and qualifications in the agreements, according to Pearson, merely allow the government to deny what is in reality a straightforward promise of leniency in exchange for favorable testimony.

Leaving aside the asserted defects in the written agreements themselves, Pearson also argues that the government's examination of the witnesses gave a misleading impression of their reasons for testifying. Most of the witnesses (but not Ross) said on direct examination that they were testifying as required under a plea agreement, but they also testified in lockstep that they had not been "promised" anything for their testimony. Pearson claims that this way of answering the question——often suggested by the prosecutor's arguably leading questions——gave the jury a mistaken impression of what the witnesses really stood to gain by testifying against Pearson and his associates.

We have little difficulty in rejecting the first part of Pearson's argument, namely that the language of the plea agreements themselves misstates the true deal between the government and the cooperating defendant. As the government

26

explains, the careful "no promises" language of the written plea agreements is itself a response to cases holding that agreements without such hedges strip the government of its discretion over whether to request a downward departure.  See, e.g., <u>United States v. Watson</u>, 988 F.2d 544, 548, 551-53 (5th Cir. 1993); <u>United States v. Melton</u>, 930 F.2d 1096, 1098-99 (5th Cir. 1991); <u>see also</u> <u>United States v. Garcia-Bonilla</u>, 11 F.3d 45, 46-47 (5th Cir. 1993) (contrasting such agreements with an agreement, like the ones here, that reserves the government's discretion).  The language reserving the government's discretion is therefore both appropriate and accurate, even though the government regularly requests a downward departure when a defendant renders substantial assistance.

Pearson's second type of argument, namely that the government allowed the witnesses to misrepresent their plea agreements, is stronger.  To be sure, we would not require the prosecution to pound away at the credibility of its own cooperating witness by exploring all of the witness's motives to curry favor with the government.  The testimony of witness Ross is quite troubling, however, because the only question remotely touching on that subject was a question whether he had been promised anything to testify, which Ross answered in the negative.  This tended to convey an improper and misleading impression that Ross was wholly disinterested.  <u>See</u> <u>United States v. Barham</u>, 595 F.2d 231, 239-41 (5th Cir. 1979) (criticizing a

27

similar style of questioning).  His plea agreement stated that the government may, but was not required to, file a motion for a downward departure if Ross gave substantial assistance; the agreement explicitly stated that no promises were made in that regard.  To that extent, Ross's statement that he had been promised nothing was at least technically accurate.  The agreement does state, however, that "the United States will advise the Court of any assistance provided by the Defendant."  Thus, although Ross certainly was not promised a downward departure, or even a motion for one, he was at least promised something.  To that extent, his testimony on direct was not only misleading but false as well, if only in a relatively small way.[9]  Ross's testimony differs from the testimony of witnesses Jackson and Washington, whose testimony on direct examination was technically accurate and did not misleadingly suggest that they were wholly disinterested.

---

[9] Similarly false was witness Christopher Larry's negative response to the question whether he had been promised anything for testifying.  But unlike the case with Ross, Larry's direct testimony at least revealed that he was testifying pursuant to a plea agreement.  His plea agreement said that the government would inform the court of any assistance and would consider filing a motion to reduce his sentence.  Larry's plea agreement was explored in some detail on cross-examination, and it was put into evidence.  Also false was a statement made during cross-examination by witness Darnell Atkins, who admitted on direct examination that he was cooperating pursuant to a plea agreement but then stated at one point during cross-examination that the government would not even consider a sentence reduction if he cooperated.  Larry and Atkins did not offer testimony against Pearson, only against the Browns.

The existence and terms of Ross's plea agreement were explored in some detail on cross-examination.  To be sure, this does not excuse the government from its affirmative duty not to let its witnesses testify falsely; it is not the defendant's job to correct the testimony.  Mason, 293 F.3d at 829; United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977).  Nonetheless, since there is no Giglio violation unless the testimony was material——i.e., unless it could "in any reasonable likelihood have affected the judgment of the jury"——revelations on cross-examination can dispel any incorrect impression given to the jury by the testimony on direct.  It is therefore relevant that Pearson's lawyer elicited that Ross had a plea agreement and that he could receive a sentence reduction for substantial assistance.  Indeed, the motives of all nine of the cooperating witnesses highlighted in Pearson's brief were explored in some detail in cross-examination.  (For those witnesses who did not testify against Pearson, this cross-examination was conducted by the Browns, who were very persistent in this regard.)  Thus, whatever the shortcomings in the direct examinations, the overall effect of the testimony was not materially misleading to the jury.

A significant feature of Giglio and Napue is that in those cases the prosecution's case hinged largely on the testimony of a single witness whose arrangement with the government was hidden from the jury.  Since the key witnesses in those cases testified falsely as to their agreements with the government, the jury's

29

verdict was thrown into doubt.  Here, there was testimony against Pearson from at least seven witnesses.  Pearson's claims of misrepresentation are directed at only three of them, and we have concluded that cross-examination repaired the defects in the direct examinations.  Pearson correctly points out that almost all of the evidence against him came from convicted felons and paid informants, but this was a matter for the jury to weigh.  It is clear that the jury, through a combination of the trial testimony and its own common sense, realized that all of the cooperating witnesses had substantial motives to curry favor with the prosecution.  These witnesses' motives were brought to the jurors' attention again in the jury instructions, in which the judge warned the jury to take special care when evaluating the credibility of cooperating witnesses.  In sum, while there was some false testimony offered in this case, we are convinced that there is no reasonable likelihood that it procured Pearson's conviction.[10]

B.    Apprendi issues

Pearson raises two arguments based on the reasoning of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000).  First, he argues that the drug quantity used to determine his sentence must be found by a jury rather than by the

---

[10]    We are even more convinced of this conclusion regarding Timothy Brown, who adopts Pearson's arguments on this issue. Although there was some testimony against Brown that we would fault, see supra note 9, the case against Brown was overwhelming and included testimony from people other than cooperating felons.

30

sentencing judge, even though the sentence Pearson received was below the statutory maximum. Second, he contends that 21 U.S.C. § 841(b) is unconstitutional. Pearson raises these arguments here, as he did at trial,[11] solely to preserve the issues for possible further review; he admits that both arguments are foreclosed by circuit precedent. See, e.g., United States v. McIntosh, 280 F.3d 479, 484 (5th Cir. 2002) ("[N]o Apprendi violation occurs where a fact used in sentencing that was not alleged in an indictment and proved to a jury does not increase the sentence beyond the statutory maximum."); United States v. Slaughter, 238 F.3d 580, 582 (5th Cir. 2001) (rejecting a constitutional challenge to 21 U.S.C. § 841(b)).

## V. FORFEITURE ISSUES

Betty Brown is the Brown brothers' mother, and Tongula Veal is Timothy's common-law wife. Their appeal challenges the forfeiture of some of the property connected to the Browns' drug enterprise. To the extent that their argument involves the construction and constitutionality of the relevant federal statutes, our review is de novo. United States v. Perez-Macias, 335 F.3d 421, 425 (5th Cir.), cert. denied, 124 S. Ct. 495 (2003); United States v. Rasco, 123 F.3d 222, 226 (5th Cir. 1997). To the extent that they would have the district court excuse an untimely filing or permit an amended claim, our review

---

[11] Timothy Brown, who joins in the Apprendi arguments, did not raise them in the district court.

31

is for abuse of discretion.  Cf. S.W. Bell Tel. Co. v. El Paso, 346 F.3d 541, 546 (5th Cir. 2003); Coburn Supply Co. v. Kohler Co., 342 F.3d 372, 376 (5th Cir. 2003).

A.   Relevant facts

The indictment included criminal forfeiture counts under 21 U.S.C. § 853 (criminal forfeiture of proceeds of drug crimes) and 18 U.S.C. § 982 (criminal forfeiture of property related to, inter alia, money laundering offenses).  After considering the jury's verdict and the evidence at trial, the district judge found in the government's favor on the forfeiture counts on January 25, 2002.  An initial order of forfeiture—encompassing $800,000 in cash, two parcels of real property, and three cars—was entered on February 4.  The court's order further provided that any third parties claiming an interest in the property must file a petition within thirty days of the date of the final published notice of forfeiture or the date that the party received actual notice, whichever came earlier.  A notice of the order of forfeiture was sent to Betty Brown by certified mail on February 6, and she received it on February 8.  Notice of the order of forfeiture was also published in the local newspaper three times, beginning on February 15 and ending on March 1.

On February 27, Brown and Veal filed separate innocent-owner petitions on behalf of BLSB, Inc. and WWTO, Inc., respectively.  BLSB's filing concerned one of the parcels of real property and two cars; WWTO's filing concerned one car.  The petitions claimed

32

that the corporations were the "100% lawful owner[s]" of the subject property. Each woman signed her petition on the corporation's behalf as "President and Sole shareholder." The district court, in an order dated March 5, refused to entertain these petitions on the grounds that a corporation can only appear through a licensed attorney. See S.W. Express Co. v. ICC, 670 F.2d 53, 55-56 (5th Cir. 1982). On March 14, Brown and Veal jointly filed a document styled "Request for Extension of Time to Employ Counsel." On March 19, the district judge entered a handwritten order stating, in full: "No order is required for the corporations to engage the services of an attorney."

Brown and Veal filed new innocent-owner petitions over seven months later, on October 30, but this time in their individual capacities. The women claimed to be the "100% lawful owner[s]" of the subject property and stated that, "Property was acquired lawfully through corporation owned solely by claimant and all interest in property is vested [in] claimant." The petitions were accompanied by certificates of dissolution for BLSB and WWTO, also dated October 30. The government responded to the new petitions and, on March 24, 2002, the district court denied Brown's and Veal's October 30 petitions as untimely, since they were filed well over thirty days after notice of the forfeiture.

B.    Analysis

Proceeding pro se on appeal, Brown and Veal argue that the October 30 filings, in which the women asserted claims to the

property as individuals, operated as "amendments" to their corporations' timely February 27 filings. The later filings therefore relate back to the earlier date and are thus also timely, they contend.

According to the applicable forfeiture statute, a person claiming a legal interest in property that has been ordered forfeited "may, within thirty days of the final publication of notice or his receipt of notice . . . whichever is earlier, petition the court for a hearing" to adjudicate the claim. 21 U.S.C. § 853(n)(2) (2000).[12] After the court rules on any petitions, or if no such petitions are filed within the thirty-day period, the government gains clear title to the property. Id. § 853(n)(7). For Betty Brown, who received individual notice of the forfeiture order, the thirty-day period began on February 8; for Veal, the period began on March 1. The appellants' October 30 notices are therefore well outside the thirty-day period provided in the statute.

It is true that the corporations' February 27 filings were within the statutory period, but there does not appear to be any authority supporting the argument that the October 30 petitions should be considered "amendments" that relate back to the earlier filing date. The October 30 filings had nothing to "amend"

---

[12]    Only one of the indictment's two forfeiture counts arose under 21 U.S.C. § 853. The other forfeiture count arose under 18 U.S.C. § 982, but it is likewise governed by the procedures of 21 U.S.C. § 853. See 18 U.S.C. § 982(b)(1) (2000).

inasmuch as the original filings were so defective that the court refused to consider them.  Cf. Kansa Reins. Co. v. Cong. Mortgage Corp. of Tex., 20 F.3d 1362, 1367 (5th Cir. 1994) (explaining, in a case involving Federal Rule of Civil Procedure 15, that "in order for an amended pleading to relate back for statute of limitations purposes, there must be a previous pleading to which the amendment dates back" (internal quotation marks omitted)).

Brown and Veal contend that were advised by an attorney to file the original innocent-owner claims in the names of their corporations.  While it may be within the discretion of the district court to look past an untimely filing when there is excusable neglect - a matter as to which we express no opinion - here over seven months passed from the court's order rejecting the corporate filings until the filing of the new petitions.  The district court did not err in denying the claims as untimely.

In addition to arguing that their innocent-owner petitions were timely, Brown and Veal also contend that forfeiture of the subject assets is unconstitutional because the federal government lacks a general police power.  This argument is without merit.  Since the Commerce Clause gives Congress the authority to punish drug conspiracies such as the one involved in this case, see supra III.B, Congress can also enact forfeiture statutes as a necessary and proper means of effectuating that Commerce Clause power.  U.S. CONST. art. I, § 8, cl. 18; United States v. Curtis, 965 F.2d 610, 616 (8th Cir. 1992).

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions and sentences of Christopher Brown, Timothy Brown, and Kenneth Pearson. We also AFFIRM the district court's denial of Betty Brown's and Tongula Veal's innocent-owner claims.